**LORETTO HEIGHTS COLLEGE,**
Petitioner,

v.

The **NATIONAL LABOR RELATIONS BOARD,** Respondent,

and

**Loretto Heights College/Faculty Education Association, Intervenor.**

No. 82–2332.

United States Court of Appeals,
Tenth Circuit.

Sept. 4, 1984.

John L. Ferguson, Denver, Colo. (Steven F. Biskup, Denver, Colo., with him on brief) of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for petitioner.

Patrick Szymanski, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Sandra Shands Elligers, Atty., N.L.R.B., Washington, D.C., on brief), for respondent.

Robert H. Chanin, Washington, D.C. (Mitchell E. Roth, Washington, D.C., and George Price, Aurora, Colo., with him on brief), for intervenor.

Before McWILLIAMS, BREITENSTEIN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This case is before us on the petition of Loretto Heights College to review and set aside an order of the National Labor Relations Board and on the cross-application of the Board for enforcement of its order. The Board found that the College violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1982) (the Act), by withdrawing recognition of and refusing to bargain with the Loretto Heights College/Faculty Education Association (the Association), the certified

exclusive bargaining representative of the College's faculty. The College argues that the faculty members are managerial employees within the meaning of *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), and therefore are excluded from the Act's coverage. Based on our review of the record as a whole, we conclude that the Board's decision is consistent with the applicable law and supported by substantial evidence. Accordingly, we grant enforcement of its order.

## I.

## BACKGROUND

Loretto Heights College is a four-year liberal arts college located in Denver, Colorado. The College was established in 1918 by the Sisters of Loretto as a parochial school for women. It became independent in 1968 and coeducational in 1970. At the time of the proceedings below, the College had a student body of approximately 850, a full-time faculty of 60 to 65, a part-time faculty of 30 to 35, and an administrative staff of about 26 or 27.

The faculty began organizing in 1971, and in 1972 the Association was certified as the collective bargaining representative for all regular full and part-time professional employees carrying at least a one-fourth faculty load.[1] The College and the Association thereafter began negotiations and ultimately entered into a series of collective bargaining agreements, the last of which expired in May 1980. A few months before the final contract expired, the College gave notice of its intent to terminate the agreement at the end of its term. It advised the Association that in light of the recent Supreme Court decision in *Yeshiva*, 444 U.S. 672, 100 S.Ct. at 856, it had some questions concerning its duty to bargain with the Association. After exchanging correspondence, the parties discontinued their discussions. The College withdrew its recognition of the Association and refused to negotiate further, although it continued to adhere to most of the provisions of the expired contract.

The Association subsequently filed an unfair labor practice charge with the NLRB, alleging that the College's actions violated sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. § 158(a)(1), (5). The Board issued a complaint against the College, and the case was tried before an administrative law judge (ALJ) in March 1981. The ALJ found the College in violation of the Act and issued a recommended order requiring inter alia that the College recognize and bargain with the Association. In so ruling, the ALJ rejected the College's argument that the faculty members were managerial employees and therefore excluded from the Act's coverage under *Yeshiva*. On review, the Board affirmed the findings and conclusions of the ALJ, with one qualification,[2] and adopted his recommended order.

## II.

## THE *YESHIVA* DECISION

In *NLRB v. Yeshiva*, the Supreme Court examined the faculty at Yeshiva University and concluded that its members were managerial employees and hence excluded from coverage under the Act. The Court defined "managerial employees" as "those who 'formulate and effectuate management policies by expressing and making operative the decisions of their employers.'" 444 U.S. at 682, 100 S.Ct. at 862 (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 288, 94 S.Ct. 1757, 1768, 40 L.Ed.2d 134 (1974)). Such employees are

1. The Board clarified the unit in 1973, setting out specifically the various ranks of faculty included in and excluded from the unit.

2. The Board found it unnecessary to pass upon the ALJ's discussion of the "divergence of interests" between the faculty and the College, concluding that the other reasons cited by the ALJ were sufficient to support his finding that the faculty members were not managerial employees within the meaning of *Yeshiva*. As the ALJ's divergence of interests analysis is therefore not a basis for the Board's decision, the validity of that rationale is not an issue properly before us and we express no opinion on the matter.

excluded from the Act's coverage, the Court explained, in order to ensure that they will not divide their loyalty between their employer and the union. *Id.* at 682, 687–88, 100 S.Ct. at 862, 864–65. The assumption underlying this rationale is that an employer is entitled to the undivided loyalty of its representatives. Accordingly, for the exclusion to apply, an employee "must exercise discretion within, or even independently of, established employer policy and must be aligned with management." *Id.* 444 U.S. at 683, 100 S.Ct. at 862. The Court indicated that normally an employee will be considered aligned with management "only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Id.*

Conversely, "employees whose decision making is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty." *Id.* at 690, 100 S.Ct. at 866. For example, architects and engineers who function as project captains on work being performed by teams of professionals are not considered managerial despite their substantial planning responsibility and authority to direct team members. *Id.* at 690 n. 30, 100 S.Ct. at 866 n. 30. Similarly, in the health care context, no exclusion will lie where "the decisions alleged to be managerial or supervisory are 'incidental to' or 'in addition to' the treatment of patients." *Id.* Thus, "[o]nly if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management." *Id.* at 690, 100 S.Ct. at 866.

In reviewing the role of the faculty at Yeshiva, the Court had no difficulty approving the Second Circuit's conclusion that the faculty members were " 'in effect, substantially and pervasively operating the enterprise.' " *Id.* at 679, 100 S.Ct. at 860

(quoting *NLRB v. Yeshiva University,* 582 F.2d 686, 698 (2d Cir.1978)). The evidence showed that although a central administrative hierarchy headed by the Board of Trustees and the President oversaw Yeshiva's five undergraduate and eight graduate schools, the individual schools were "substantially autonomous." *Id.* 444 U.S. at 676, 100 S.Ct. at 859. Each was headed by a dean or director, and the faculty members met formally and informally to discuss and decide matters of institutional and professional concern. Most schools also had faculty committees involved with particular areas of educational policy. The Court observed that "[t]hrough these meetings and committees, the faculty at each school effectively determine its curriculum, grading system, admission and matriculation standards, academic calendars, and course schedules." *Id.* at 676 & n. 4, 100 S.Ct. at 859 & n. 4.

The faculty at each school also made recommendations to its respective dean or director concerning faculty hiring, tenure, sabbaticals, termination, and promotion. Although the central administration ultimately made such decisions, with the advice of the dean or director involved, faculty recommendations were followed in the "overwhelming majority" of cases. *Id.* at 677 & n. 5, 100 S.Ct. at 859 & n. 5.[3] In addition, the faculty at some schools made final decisions regarding the admission, expulsion, and graduation of individual students. Other faculty had decided such matters as teaching loads, student absence policies, tuition, and even the location of a school in one instance. *Id.* at 677 & n. 6, 100 S.Ct. at 859 & n. 6. Based on all the above facts, the Court concluded:

> "The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what

**3.** The Court emphasized that the presence of a rarely exercised veto power by the administration did not diminish the faculty's "effective power in policymaking and implementation."

444 U.S. at 683 n. 17, 100 S.Ct. at 862 n. 17. The "relevant consideration," the Court stated, "is effective recommendation or control rather than final authority." *Id.*

courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these. To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and the customers who will be served."

*Id.* at 686, 100 S.Ct. at 864.[4]

The Court further found that application of the managerial exclusion in this case would well serve the doctrine's underlying purpose. As the Court pointed out, the problem of divided loyalty is "particularly acute" for a university like Yeshiva, "which depends on the professional judgment of its faculty to formulate and apply crucial policies constrained only by necessarily general institutional goals." *Id.* at 689, 100 S.Ct. at 865. Such a school necessarily requires faculty participation in governance "because professional expertise is indispensable to the formulation and implementation of academic policy." *Id.*

## III.

## COLLEGE GOVERNANCE AT LORETTO HEIGHTS

As the Court's opinion makes clear, the faculty at Yeshiva exercised an extraordinary amount of authority in the operation of the university. Indeed, the Board in that case did not contend that the Yeshiva faculty's role in university decision making was too insignificant to be deemed managerial. Rather, the Board's chief argument was that the faculty was not aligned with management because it exercised "independent professional judgment" in its own interest rather than in the interest of the university.[5] *See id.* at 683–85, 100 S.Ct. at 862–63. Here, by contrast, the significance of the faculty's role in College governance is sharply disputed by the parties and constitutes the heart of the issue before us. In order to determine whether faculty authority at the College is "managerial" within the meaning of *Yeshiva*, we must examine the overall structure of the College and the role of the faculty in the College's operation and governance.[6]

Ultimate authority for the operation of the College is vested in the Board of Trustees which consists of 21 to 25 members.

---

**4.** The court also found that faculty members at Yeshiva played a "predominant role in faculty hiring, tenure, sabbaticals, termination and promotion." 444 U.S. at 686 n. 23, 100 S.Ct. at 864 n. 23. However, because these decisions implicated supervisory as well as managerial characteristics and the Court did not reach the question of supervisory status, it found it unnecessary to rely primarily on these features of faculty authority. The Court indicated moreover that additional factors could enter into the analysis in other contexts. It deemed it plain, for instance, that "professors may not be excluded merely because they determine the content of their own courses, evaluate their own students, and supervise their own research." *Id.* at 690 n. 31, 100 S.Ct. at 866 n. 31.

**5.** The Court rejected this argument, noting that where a university depends on academic policies that largely are formulated and implemented by faculty governance decisions, the faculty's professional interests cannot be separated from those of the institution. *See* 444 U.S. at 688–89, 100 S.Ct. at 866. Thus, if the faculty does in fact formulate and implement management policies on which the university relies, as was the case in *Yeshiva*, the faculty will not be considered nonmanagerial merely because in exercising such authority it also acts in its own best interests.

**6.** The facts set forth below are not seriously contested by the parties. Although the College does take issue with several of the ALJ's findings, the essential dispute in this case concerns the proper interpretation and application of *Yeshiva*. To the extent the facts themselves are in dispute, we hold that the ALJ's findings of fact are supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e) (1982); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488–91, 71 S.Ct. 456, 464–66, 95 L.Ed. 456 (1951); *Presbyterian/St. Luke's Medical Center v. NLRB*, 723 F.2d 1468, 1471 (10th Cir.1983).

The chief executive officer is the President, who is subordinate in authority only to the Board of Trustees. The President is aided administratively by five division heads, the Academic Dean, the Dean of Campus Life, the Director of Admissions, the Director of Fiscal Operations, and the Vice President for External Affairs. These division heads are responsible to the President, and are assisted by some fourteen additional administrative and staff personnel.

The College's academic program is divided into six regular program areas and a special programs area. The six regular programs are nursing, teacher education, humanities and sciences, fine arts, business, and the University Without Walls. Each area is administered by a program director. Although program directors also teach, they have varying and often reduced course loads and are considered part of the administration.[7] One or two programs also have coordinators, who assist program directors in areas of natural grouping such as social sciences. Program areas are further broken down into disciplines—individual areas of specialized study such as sociology, mathematics, or history.

Faculty participation in College governance occurs largely through committees and other such groups. The largest of these is the Academic Forum, a college-wide self-governing body comprised of all full and part-time faculty, including program directors. The Academic Dean also is a participating member, although he has no voting privilege. The Forum meets regularly and discusses academic policy and other matters of interest. Under its by-laws, it may make recommendations to appropriate committees or administrators on a variety of subjects and it is to "actively share in decision making" in matters that pertain to the philosophy and objectives of the College, curriculum changes affecting existing programs, admission, retention, and graduation policies, the academic calendar, and the College's "Governance Policies" document.[8] *See* Rec., vol. III, at 1133–35.

The Faculty Administration Relations Council (FARC) is an advisory council to the College President, headed by the President and including four administrators and four faculty members. The FARC was involved in the development of the College's academic policies, which set forth the criteria for student admission, grading and graduation, and academic practices which students are expected to follow. The FARC periodically reviews these policies with program area faculty and makes changes as necessary.[9]

The Rank Committee, composed of five full-time faculty members, reviews and makes recommendations to the President concerning policies and criteria on faculty rank and, applying approved criteria, makes recommendations to the President concerning promotion of faculty members. In making such determinations, the committee reviews written recommendations from the appropriate program director and the Academic Dean, whose recommendations it never has rejected outright.[10] The

---

7. Program directors are specifically excluded from the faculty bargaining unit.

8. The Forum also was involved in the preparation of three institutional self-study reports which the College produced in order to receive accreditation for its nursing and education programs. These reports, written largely by the faculty, extensively discussed all facets of the individual programs as well as the College generally, including its philosophy, purposes, and goals.

9. The FARC also was instrumental in the creation of several task forces that studied and made recommendations concerning the academic structure and curriculum of the College.

Some of these recommendations were acted upon and ultimately resulted in the consolidation of three program areas and the creation of a new business administration program.

10. Academic Dean Antony Parimanath testified that the committee had on occasion disagreed "partially, but not fully" with his recommendations. Rec., vol. I, at 228. Dean Parimanath was the chief witness for the College at the trial of the case. Robert Amundson, a sociology professor and one-time president of the Association, was the principal witness for the General Counsel and the Association.

President has accepted all of the Rank Committee's recommendations in the past five years.

The Tenure Committee, consisting of five full-time tenured faculty members and two program directors, functions similarly to the Rank Committee, making recommendations to the President on tenure of individual faculty members and tenure policies and procedures generally. The Tenure Committee, like the Rank Committee, receives evaluations of applicants from the applicant himself, students, colleagues, the appropriate program director, and the Academic Dean. In recent years, the committee has not disagreed with any recommendations of the Academic Dean, and the President has followed all of the committee's recommendations.[11]

The Faculty Review Committee, comprised of five full-time faculty members, operates as an optional second stage in the three-step grievance procedure contained in the most recent collective bargaining agreement. The committee makes recommendations concerning the disposition of a grievance to the President, who may accept the recommendation or reject it with written reasons. The record contains only one instance of action by the committee, on a grievance matter relating to tenure. In that case, the committee agreed with the President's decision to deny tenure.

The Affirmative Action Committee is composed of "a representative number of faculty, staff, and students as appointed by the President." Rec., vol. IV, at 1981. Its purpose is to assist and advise the Affirmative Action Officer and the President in the implementation of affirmative action and nondiscrimination policies and procedure, and compliance review.[12]

The Faculty Evaluation Committee, composed of three full-time faculty members and two students, is concerned with the procedures by which faculty are evaluated by students and colleagues. The committee develops and administers the evaluation instruments and procedures, subject to approval by the appropriate division heads, and provides the results to the appropriate division heads, program directors, and, when needed, the rank and tenure committees.

The Academic Review Committee, made up entirely of administrators, deals with student retention matters. Its function is to review the standing of any student who is not making satisfactory academic progress and to determine an appropriate sanction, such as academic probation or dismissal. As noted above, the academic policies against which a student's performance is measured were developed and periodically are modified in consultation with faculty members and the FARC.

The Sabbatical Committee is chaired by the Academic Dean, and includes one program director and two full-time faculty members. A faculty member seeking sabbatical leave first discusses the matter with his program director, who sends the committee a summary of the discussion along with a recommendation. The committee reviews all applications for sabbatical and makes a recommendation to the President. Since its inception, all of the committee's recommendations have been approved.

The Program Review and Recommendation Committee (PRRC) is comprised of five

---

11. If the President were to reject a recommendation of either the rank or tenure Committee, she would be required to set forth her reason for doing so in writing and, upon request, meet with the committee to discuss the decision.

12. Robert Amundson, a member of the faculty who has served on the committee, testified that in 1974 the Director of Personnel issued the College's affirmative action plan without affording members of the committee an opportunity to review and comment upon the final draft. In response to Dr. Amundson's protest, then College President Ronald Hayes wrote a letter to Amundson which concluded: "I regret that you have found difficulty in accepting that the role of the committee was to make recommendations. It was not the role of the committee to determine the affirmative action policy." Rec., vol. II, at 1060. Amundson testified that no other affirmative action plans have been issued. He also testified that the committee recently had recommended that the College hire a full-time affirmative action officer, but none had yet been hired.

faculty members who are nominated through the Academic Forum and appointed by the College President, the Academic Dean, and the Forum's officers. The PRRC reviews programs to determine whether they are consistent with the goals of the College and whether any overlap exists among the courses offered by the College. The committee also reviews and makes recommendations concerning new course proposals. Before reaching the PRRC, such a proposal must first be approved at the discipline and program levels. After review by the PRRC, the matter is submitted to the Academic Dean for his comment. Both the PRRC and the general faculty, through the Academic Forum, review and make recommendations concerning the introduction of new majors, minors, degrees, and interdisciplinary programs. In addition to discipline and program level approval, changes of this nature must also be approved by the Academic Dean, the President, and except in the case of new minors, the Board of Trustees.

The composition of the Research Committee is not mandated and has varied among faculty members and program directors. The committee reviews faculty applications for research funds and makes recommendations to the Academic Dean concerning allocation of the $1,000 available for research projects. In 1978 the Academic Dean refused to approve a proposal recommended by the committee.

Other than committee work, the participation of faculty members in College governance relates primarily to decision making within or concerning particular program areas. For example, faculty members within a particular discipline or pro-

gram area participate in the hiring of new full-time faculty members for that area by selecting and interviewing applicants and making recommendations to the Academic Dean.[13] The faculty sometimes recommends a salary level for a position as well, in order to attract and hire a particularly qualified candidate. The Academic Dean has followed faculty hiring recommendations in all cases. Termination decisions, on the other hand, are made by the Academic Dean without faculty participation.

Program directors are selected by the Academic Dean from within the relevant program area on the basis of faculty recommendations. Faculty members also have participated in the selection of College presidents through membership on search teams, which interview prospective candidates and make recommendations to the Board of Trustees. In the case of current President Adele Phelan, the search team consisted of two members of the Board of Trustees, one student, two administrators, and two faculty members. However, according to Dr. Amundson's testimony, the Board appointed Phelan president before the search team had finished making its selections.[14]

Faculty members also play a significant role in curriculum development within their program areas. In conjunction with the program director, program area faculty members determine the content of courses, scheduling of courses, and course requirements for majors.[15] They also decide with the program director whether students will be admitted to a major, although faculty members are not authorized to expel students from a major. Outside of their own

---

13. The faculty often but not always participates in the hiring of part-time faculty members.

14. Appointments at the dean and vice president levels also involve search teams with faculty membership. However, the faculty plays no part in the hiring of other administrative or staff personnel. Moreover, the faculty has no part in the regular procedures for terminating administration officials, although faculty pressure was instrumental in effecting the departure of a former president and an academic vice president.

15. Faculty members also are responsible for the classroom conduct of their students, and for their own teaching and grading methods. Although a faculty member may suggest limitations on enrollment in a particular course, the registrar has not always heeded such requests. Additionally, the Academic Dean can require, within certain limits, that a faculty member teach classes outside the normal teaching hours or during student recess.

disciplines or program areas, faculty participation in curriculum development and like matters is minimal.[16]

Finally, faculty members have a very limited degree of input into the budget process within their particular areas. Program directors annually distribute "budget sheets" to program area faculty who fill in the forms and return them to the program director. These sheets list the approved budget items for the previous year and have space for the faculty to indicate their expected needs, within certain guidelines, for the coming year. The program director collects this data from the faculty, puts together a proposed budget for his or her area, and then meets with the Academic Dean and Director of Fiscal Operations to work up a final operations budget for submission to the President and Board of Trustees. Faculty members generally receive no notice of action taken with regard to the budget unless they specifically request information.[17]

## IV.

## MANAGERIAL STATUS

■ It is evident from these facts that faculty members at Loretto Heights play a substantial role in College governance, participating in decision making and implementation in a wide range of areas. It is equally clear, however, that the faculty's authority in most aspects of College governance is severely circumscribed. Thus, while faculty members do take part in the formulation and implementation of management policy, *see, Yeshiva,* 444 U.S. at 682, 100 S.Ct. at 862, their role does not in our view rise to the level of "effective recommendation or control" contemplated

in *Yeshiva. Id.* at 683 n. 17, 100 S.Ct. at 862 n. 17.

So far as the extent of faculty authority is concerned, the record reveals a number of areas, particularly outside the academic sphere, in which the faculty plays little if any role. For example, the ALJ found that faculty participation is "all but nonexistent" in the College's "business affairs," including such activities as the lease and sale of real estate, the purchase of supplies and equipment for non-classroom use, and the employment and termination of nonacademic and office personnel. Rec., vol. V, at 2107. Faculty members also play virtually no role in the admission, retention, and expulsion of students from the College, the size of the student body, awarding honorary degrees, establishing tuition requirements, or making financial aid determinations. *Id.* Of course, to the extent many of these areas are outside the academic realm, lack of faculty participation is of only limited significance, as the ALJ recognized. *See id.* at 2108. Since the " 'business' of a university is education," *Yeshiva,* 444 U.S. at 688, 100 S.Ct. at 865, we must focus our attention on the faculty's role in academic affairs in order to determine the question of managerial status.[18]

Unlike *Yeshiva,* where each school's faculty apparently met and decided most academic matters as a collective body, the faculty at Loretto Heights participates in such matters primarily through its representation on a number of committees. These committees vary widely both in terms of their own significance and in the scope and effect of the role afforded the faculty representatives. Some committee work, for example, is of a minor nature in

**16.** For example the College's Mountain Bell program, an off-campus program enabling telephone company employees to earn degrees through part-time study, was instituted, and its curriculum established and developed, without the participation of the PRRC or faculty members teaching similar courses in the College's regular programs.

**17.** In addition to all the above, the ALJ found that the faculty also plays a role in establishing the academic calendar, reviewing and upgrad-

ing teaching facilities, and determining grading criteria.

**18.** Nevertheless, it is worth noting that at least some of the faculty members at Yeshiva participated in a number of the activities mentioned above, including admission, retention, and expulsion decisions, and the establishment of enrollment and tuition levels. *See Yeshiva,* 444 U.S. at 676–77, 686, 100 S.Ct. at 859, 864.

comparison to the other functions routinely performed by the faculty. The record shows that the Sabbatical Committee, Faculty Review Committee, Tenure Committee, and Rank Committee, among others, have met infrequently and only for short periods of time in performing their functions in past years.[19] Thus, while these committees may in fact perform important functions, the extent of faculty involvement in the committees' work is so limited as to be "only incidental to, or in addition to, their primary function of teaching, research, and writing," rather than truly managerial in nature. Rec., vol. V, at 2130. *See Yeshiva,* 444 U.S. at 690 & n. 30, 100 S.Ct. at 866 & n. 30.

Several other committees, including the Affirmative Action Committee, Faculty Evaluation Committee, and Research Committee, are in themselves relatively ineffective or insignificant in terms of their impact on College governance, notwithstanding the time commitments membership on such committees may require. For example, the Research Committee, which at times has not even included any members of the faculty, makes allocation recommendations regarding a mere $1,000. Similarly, the Faculty Evaluation Committee, which includes both students and faculty, plays a role only in the development of evaluation procedures and does not itself evaluate anyone. On the other hand, the Affirmative Action Committee functions in a significant policy area, but appears to be a fairly ineffective body in terms of its actual impact on the College, and one which the College administration apparently has felt free to ignore repeatedly in the past.

Even in those organizations that carry more weight in the College's academic structure—particularly the Academic Forum, the FARC, and the PRRC—faculty power is more theoretical than actual. For example, although the bylaws of the Academic Forum provide that it shall share in decision making with regard to such areas as College philosophy, curriculum changes, and admission, retention, and graduation policies, these decisions are made largely through the committees and task forces outlined above. The Forum does appoint the faculty membership of many of these groups and, as discussed above, the Forum must approve major curriculum changes, such as the introduction of new majors, minors, and degrees. However, there is little other evidence of direct, meaningful involvement by the Forum in College governance, and any input it has is primarily of an advisory nature.

The FARC is an advisory body which is composed predominantly of administrators.[20] Although it appears from the record that the FARC plays an important role in the development and review of the College's academic policies, against which students' academic standing is measured,[21] effective control of these policies scarcely can be imputed to the faculty when it comprises a minority of the Council. Similarly, although the PRRC is composed solely of faculty and plays a significant role in curriculum development and review, it lacks final decision making authority. Its function is simply to review and recommend. Moreover, in the case of curriculum changes, PRRC review is merely one intermediary step in a long process that requires approval both at the program level

---

**19.** For example, Dean Parimanath testified that the Sabbatical Committee had met only two or three times since September 1980, for approximately an hour and a half each time. Likewise, Dr. Amundson testified that the Faculty Review Committee met approximately eight hours on only one case during his membership from 1976 to 1978; that the Tenure Committee met a total of about twenty hours during the 1980–81 academic year; and that he expected the Rank Committee, of which he was also a member, to meet only slightly more.

**20.** As noted above, the FARC includes four faculty members and four administrators, plus the President who serves as the chair.

**21.** The Academic Review Committee, composed solely of administrators, reviews students' academic performance in light of the academic policies and determines whether to dismiss, suspend, or otherwise sanction students whose progress is unsatisfactory.

prior to PRRC review, and by the Academic Dean after PRRC review.[22]

As these examples make clear, faculty power at the College, whatever its extent on paper, is in practice severely diluted. In light of the infrequent or insignificant nature of some committee work, the mixed membership of many committees, the faculty's limited decision making authority, and the layers of administrative approval required for many decisions, the impact of faculty participation in College governance falls far short of the "effective recommendation or control" contemplated by *Yeshiva*. *See* 444 U.S. at 683 n. 17, 100 S.Ct. at 862 & n. 17. Outside the committee structure, as in the hiring and budget processes for example, faculty participation is similarly limited in authority and ultimately subject to one or more levels of administrative approval. Under these circumstances, we cannot say that faculty members "effectively control or implement employer policy." *Id.* at 683, 100 S.Ct. at 862. Accordingly, we agree with the Board that they are not managerial employees within the meaning of *Yeshiva*.

Moreover, we are convinced that application of the managerial exclusion in this case would in no way further the underlying goal of ensuring that employees who are aligned with management will not divide their loyalty between employer and union. In *Yeshiva*, divided loyalty was a potentially serious problem because the school depended on its faculty for the "professional expertise" that is "indispensable to the formulation and implementation of academic policy." *Id.* at 689, 100 S.Ct. at 865. As the ALJ correctly recognized, the administrative staff at Yeshiva was fairly small, at least in relation to the university's overall size, and there was no effective buffer between the faculty and top management. *See* 582 F.2d at 689–90. The university was, in effect, "compelled to rely

upon the faculty for advice, recommendations, establishment of policies, and implementation of policies." Rec., vol. V, at 2031. As a result, the Yeshiva faculty was by necessity "aligned with management." *Yeshiva*, 444 U.S. at 683, 100 S.Ct. at 862.

Here, by contrast, the administration is fairly large in relation to the size of the College. More significantly, the College has a "very effective buffer" between top management and the faculty in the form of the program directors. Rec., vol. V, at 2131. Program directors perform a wide range of administrative duties and are considered part of the College administration. They also teach courses within their particular disciplines and function in many respects like members of the faculty. Indeed, program directors generally are appointed by the Academic Dean from among the faculty of the relevant program area. Thus, program directors plainly possess the "professional expertise" that the Court deemed "indispensable" to the formulation and implementation of academic policy. The availability of this expertise within the ranks of the administration obviates the College's need to rely extensively on the professional judgment of its faculty in determining and implementing academic policy. Under these circumstances, while significant faculty input undoubtedly remains beneficial to the College, it is not necessary that the faculty be "aligned with management" as they were in *Yeshiva*. Accordingly, this case presents no problem of divided loyalty equivalent to that found in *Yeshiva*.

The record demonstrates that the program directors' expertise is in fact used substantially by the College, and that these directors play a major role in the administrative process.[23] As the ALJ observed:

"[Program] directors largely control the budget, serve in key positions on committees and task forces, are administrators

---

**22.** As noted above, new majors, degrees, and interdisciplinary programs require further approval by the Academic Forum and the Board of Trustees.

**23.** In affirming the ALJ's conclusion that the College faculty members are not managerial employees, the Board specifically cited the extensive role of the program directors in College governance.

rather than instructors (although they carry teaching loads), have office space, have private telephones, have access to secretarial services, and generally are an arm of the president for administrative purposes. Administratively, their weight far exceeds that of faculty members in the day-to-day affairs of [the College]." [24]
*Id.* at 2131.

The Academic Dean likewise plays a major and powerful role in academic affairs. He serves with the faculty on a number of committees and task forces, and he has the final word in many administrative areas. The record shows that the College has vested much reliance in his professional judgment as well, and that insofar as academic matters are concerned, "he, rather than the faculty, is the managerial authority...." [25]
*Id.* at 2131–32.

Thus, the record clearly reveals that while the faculty plays a large part in College governance, its input is just one of many factors taken into account by administration officials who in fact make the decisions and take the actions that "formulate and effectuate management policies." *Yeshiva*, 444 U.S. at 682, 100 S.Ct. at 862. We certainly cannot say of the faculty members that they "in effect, substantially and pervasively operat[e] the enterprise," *id.* at 679, 100 S.Ct. at 860, or that "[t]heir authority in academic matters is absolute," *id.* at 686, 100 S.Ct. at 864, as was the case in *Yeshiva.* To the contrary, the administration here has retained both actual and effective control of College policy making and implementation. Based on the record before us, we are convinced that the College faculty members are characterized

more accurately as employees who routinely apply their professional expertise in the course of carrying out their regular work duties, *see id.* at 690, 100 S.Ct. at 866, than as employees who "formulate and effectuate management policies by expressing and making operative the decisions of their employer," *id.* at 682, 100 S.Ct. at 862. Accordingly, we agree with the Board that the members of the College faculty are not managerial employees within the meaning of *Yeshiva,* and thus are not excluded from protection under the Act.

## V.

## CONCLUSION

In passing upon an order of the NLRB, the scope of our review is limited. We are not free to substitute our judgment for that of the Board simply because we might have decided the matter differently. *NLRB v. Pepsi-Cola Bottling Co. of Topeka,* 613 F.2d 267, 270 (10th Cir.1980). Rather, we should grant enforcement of the order "if the Board correctly interpreted and applied the law and if its findings are supported by substantial evidence in the record, considered in its entirety." *Presbyterian/St. Luke's Medical Center v. NLRB,* 723 F.2d 1468, 1471 (10th Cir.1983); *NLRB v. Carbonex Coal Co.,* 679 F.2d 200, 203 (10th Cir.1982). In construing the scope of the Act's coverage, we must accord great respect to the expertise of the Board "when its conclusions are rationally based on articulated facts and consistent with the Act." *Yeshiva,* 444 U.S. at 691, 100 S.Ct. at 867.

**24.** Unlike program directors, faculty members have little in the way of the trappings of authority. They do not have private telephones, their office space is limited, and only one secretary serves the entire faculty.

**25.** As the College correctly points out, "the relevant consideration is effective recommendation or control rather than final authority." *Yeshiva,* 444 U.S. at 683 n. 17, 100 S.Ct. at 862 n. 17. It is clear, however, that the ALJ did not rely solely on the faculty's limited authority in determining that its members are not managerial employees. Rather, this factor is simply one of

several elements—including the mixed membership of many committees, the filtering of faculty input through layers of administrative decision making, the limited nature of faculty participation in several areas, the size and pervasiveness of the College administration, and the important role of the program directors and the Academic Dean—upon which the ALJ and the Board relied in determining that under all the circumstances of the case, the faculty do not effectively control or implement employer policy within the meaning of *Yeshiva.*

After careful review of the record in this case, we perceive no reason to disturb the Board's conclusion that the faculty members at Loretto Heights College are not managerial employees within the meaning of *Yeshiva*. We are persuaded that the Board has properly interpreted and applied the *Yeshiva* decision, and that its findings are adequately supported by the record.

Accordingly, we grant enforcement of the Board's order.