**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FLORIDA MEMORIAL COLLEGE, Respondent,**

**United Faculty of Florida/Florida Memorial College Chapter, Intervenor.**

No. 86–5527.

United States Court of Appeals, Eleventh Circuit.

July 7, 1987.

Elliott Moore, Linda Dreeben, Victoria Higman, William Bernstein, N.L.R.B., Washington, D.C., for petitioner.

Mitchell E. Roth, Washington, D.C., for United Faculty of Florida/Florida Memorial College Chapter.

Herbert B. Mintz, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Miami, Fla., for respondent.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This case is before the Court on the application of the National Labor Relations Board for enforcement of its order directing Florida Memorial College to bargain with the Union. The Board found that the College violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1982), by refusing to bargain with the United Faculty of Florida, Florida Memorial College Chapter (the Union), which the Board certified as the exclusive bargaining representative for the College faculty. As we find that the Board correctly concluded that the College's faculty is not managerial or supervisory and is therefore not excluded from the application of the Act, we grant enforcement of the Board's order.

## I.

Florida Memorial is a private, nonprofit four-year liberal arts college located in the Miami area. The College is made up of six academic divisions: general studies, business administration, education, humanities, science and mathematics, and social sciences. Florida Memorial has a student body of approximately 1,000 students and employs approximately thirty-five to forty full-time faculty as well as a number of part-time adjunct faculty. The College is governed by a sixteen-member board of trustees which includes two non-voting faculty representatives.

In 1979, in response to the Union's representation petition, the regional director of the Board issued a Decision and Direction of Election for a bargaining unit made up of all full-time faculty members, professional librarians, and professional counselors employed at Florida Memorial. The unit excluded part-time faculty members, administrative staff, non-professional employees, guards, and supervisors, as defined in the Act. The Union carried the election 21 to 14 and was certified as the

exclusive bargaining representative of the employees in the Unit.[1]

In 1980, the College filed a unit clarification petition with the Board's Regional Director contending that under the Supreme Court's decision in *N.L.R.B. v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), the College's faculty members and professional dormitory counselors should be excluded from the Unit because of their managerial and/or supervisory status. The Regional Director conducted a hearing on this issue and then transferred the case to the Board for a decision. Based on its findings, the Board concluded that the faculty members and division chairpersons should not be excluded from the Unit as managerial employees and that the division chairpersons and resident managers should not be excluded as supervisors. Accordingly, the Board dismissed the College's petition.

After the Board's decision, the College continued to refuse to bargain. The Union then filed an unfair labor practice charge. The College admitted its refusal to bargain, but adhered to its position that it had no obligation to do so because the Board had erred in determining the bargaining unit. The Board found that the College had raised no novel issues and that it had indeed committed an unfair labor practice in refusing to bargain. The Board, which ordered the College to bargain with the Union, is now before this Court seeking enforcement of its order.

## II.

■ The National Labor Relations Act expressly excludes supervisors from coverage under the Act. *See* 29 U.S.C. § 152(3). While managerial employees are not similarly expressly excluded, the Supreme Court has held that the Act implies such an exclusion. *See N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 288–89, 94 S.Ct. 1757, 1768–69, 40 L.Ed.2d 134 (1974). Thus, un-

---

1. Five additional votes were not counted as the College challenged the division chairpersons' ballots on the ground that these persons are supervisors within the meaning of the Act and therefore excluded from the bargaining unit. A simple calculation reveals that even if all of the challenged ballots were cast against the Union, the Union would still have carried the election by a margin of two votes.

der the Act both supervisors and managerial employees are exempt from coverage. The reasons for these "exemption[s] grow out of the same concern: That an employer is entitled to the undivided loyalty of its representatives." *Yeshiva,* 444 U.S. at 682, 100 S.Ct. at 862; *citing Beasley v. Food Fair of North Carolina,* 416 U.S. 653, 661–62, 94 S.Ct. 2023, 2027–28, 40 L.Ed.2d 443 (1974). As such, if Florida Memorial's faculty members are properly categorized as supervisory or managerial employees under the Act then they must be excluded from the bargaining unit.

The Court has defined managerial employees as those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' " *Bell Aerospace,* 416 U.S. at 288, 94 S.Ct. at 1768, (quoting *Palace Laundry Dry Cleaning,* 75 N.L.R.B. 320, 323 n. 4 (1947)). In terms of a college faculty, the Court has said that "the relevant consideration is [the faculty's] effective recommendation or control rather than final authority," *Yeshiva,* 444 U.S. at 683 n. 17, 100 S.Ct. at 863 n. 17. In *Yeshiva,* the seminal case in this field, the Court found that the faculty was managerial because of its pervasive authority in running the University. The Court adopted the Second Circuit's conclusion that the faculty at Yeshiva " 'in effect, substantially and pervasively operat[e] the enterprise.' 582 F.2d at 698." 444 U.S. at 691, 100 S.Ct. at 867. Conversely, the Court also noted that there "may be institutions of higher learning unlike Yeshiva where the faculty are entirely or predominantly non-managerial." *Id.* at 690 n. 31, 100 S.Ct. at 866 n. 31. We find that the faculty at Florida Memorial fits into this latter category. Against the backdrop of *Yeshiva,* we hold that the Board correctly found that the faculty was not managerial.

Unlike Yeshiva's faculty, which exercised absolute authority in academic matters and considerable authority in the non-academic sphere, the faculty at Florida Memorial asserts insufficient control in terms of almost every one of the relevant criteria examined by the Court in that case. Simply put, Florida Memorial's faculty lacks the mana-

gerial characteristics considered by the Court in *Yeshiva.* A comparison of the fact pattern in this case in light of the criteria considered in *Yeshiva* illustrates this conclusion.

In *Yeshiva,* the Court considered the faculty's authority in both the academic and non-academic spheres. In terms of academic matters, the Court noted that the faculty's authority was absolute. *Id.* at 686, 100 S.Ct. at 864. Speaking in terms of the faculty's involvement in academic matters, the Court stressed that:

> They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school.

444 U.S. at 686, 100 S.Ct. at 864. Furthermore, in terms of decision-making at Yeshiva, not only were faculty decisions almost never vetoed, 444 U.S. at 676 n. 4, 100 S.Ct. at 859, n. 4, but the faculty, at times, overrode the decisions of the administration. 444 U.S. at 677 n. 5, 100 S.Ct. at 859, n. 5.

In contrast to *Yeshiva,* the faculty at Florida Memorial lack a faculty-wide governing organization through which to formulate collective faculty input as to matters at the College. While there is a faculty council, this body apparently meets only once or twice yearly and then for the sole purpose of electing two faculty members to serve as non-voting delegates on the Board of Trustees. The absence of an effective faculty-wide governing organization is in distinct contrast to *Yeshiva* where the faculty within the substantially autonomous undergraduate and graduate schools met formally, and in some instances pursuant to written bylaws, to decide matters of institutional and professional concern. 444 U.S. at 676, 100 S.Ct. at 857. *Compare N.L.R.B. v. Lewis,* 765 F.2d 616, 622 (7th Cir.1985) (faculty held to be managerial

where college governed by an assembly of all full-time faculty members).

As opposed to expressing its views through a collective decision-making body, the faculty's participation in decision-making at Florida Memorial occurs through representatives on several standing committees. These committees, however, are structured in such a manner as to significantly dilute the faculty members' participation. First of all, the faculty does not select which members will sit on these advisory committees. Rather, the Vice President of the College appoints faculty members to serve. Second, it is significant that these committees include a number of administrators and students. In fact, some of the committees are made up of a majority of nonfaculty participants. This amalgamation of membership dilutes the effectiveness of the faculty's input into the committees' recommendations. In this regard, Courts have held that such mixed committees do not indicate managerial authority on a faculty's behalf. *See N.L.R.B. v. Cooper Union for Advancement of Science,* 783 F.2d 29, 32 (2d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 70, 93 L.Ed.2d 27 (1986); *Loretto Heights College v. N.L. R.B.,* 742 F.2d 1245, 1254 (10th Cir.1984).

Beyond any participation the faculty may have in these committees, the record indicates the administration's willingness to disregard such committees' recommendations. The College's 1978 selection of a new academic dean illustrates this practice. While a search committee did submit a list of candidates for this position, the College president refused to examine it and instead instructed the committee to expand the list. Thereafter, a member of the president's cabinet added an additional candidate to the list. The president hired that candidate despite the fact that that person was the committee's fifth choice. In sum, the faculty not only lacks a method of participation through which to channel collective input but also the mechanism through which the faculty does exert input lacks effective influence in the decision-making process.

The specific decisions concerning the institution which the faculty made and which the court considered in *Yeshiva* are not similarly controlled by the faculty at Florida Memorial. *See id.,* 444 U.S. at 686, 100 S.Ct. at 864.

Unlike *Yeshiva,* the Florida Memorial faculty has no effective control over the curriculum offered. The overwhelming majority of courses follow the existing curriculum set forth in the college catalog. As the Board noted, there was no evidence that the faculty had any effective input into the preparation of this catalog. While individual faculty members may suggest new courses, addition of these courses to the curriculum requires the approval of either the academic council or the academic dean. However, as the council consists of a mixture of faculty and administrators, its influence is diluted in terms of its representativeness of the faculty's views. *See* discussion, *supra.* Furthermore, the record indicates that in the past, when faculty members have proposed new courses, the administration has played a significant role in the process between origination and implementation of new course proposals.

Although individual faculty members establish course content, determine their teaching methods, and grade their students, *Yeshiva* makes it clear that "professors may not be excluded [as managerial] merely because they determine the content of their own courses [and] evaluate their own students...." 444 U.S. at 690 n. 31, 100 S.Ct. at 866 n. 31. Moreover, at Florida Memorial, even these conceivably autonomous decisions are encroached upon by the administration. In grading students the faculty applies a grading system supplied by the academic dean's office. The faculty must also select textbooks in collaboration with the academic dean. Further, teaching loads, as well as adjustments necessitated by underenrollment or overenrollment of a given course, are within the discretion of the academic dean who makes the final decision as to whether outside help is needed or to open an additional section of a course.

The faculty's role with respect to policies affecting students is virtually nonexistent. Because the College has an open admissions policy, there is no faculty involvement in the admissions process. Further, the administration has set forth in the college catalog policies concerning student absence, probation, suspension, and expulsion. There is no evidence of general faculty involvement in either the development or implementation of these policies. Graduation requirements also are set forth in the catalog, and there is again no evidence of faculty input into these policies. Moreover, the only role played by a faculty member in applying the graduation standards is the ministerial role of the division chairperson who compares the student's record with these requirements. Thereafter, the academic dean and registrar must still approve each candidate. Further, although division chairpersons may make recommendations concerning students requests to alter the requirements, the academic dean and the registrar must approve any such requests.

In *Yeshiva*, the Court considered the faculty's involvement in the non-academic sphere. The Court noted "that faculty members at Yeshiva also play a predominant role in faculty hiring, tenure, sabbaticals, termination and promotion." 444 U.S. at 686 n. 23, 100 S.Ct. at 864 n. 23. The same cannot be said at Florida Memorial. These and other relevant nonacademic matters are under the control of the administration, particularly the president and the academic dean.

With regard to hiring, faculty participation in the process is within the discretion of the president. Moreover, such participation has lacked any pattern of consistency. Search committees have been utilized on some occasions, yet when used, the president has at times circumvented their recommendations. *Compare Yeshiva*, 444 U.S. at 677 n. 5, 100 S.Ct. at 859 n. 5

(estimated 98% of faculty hiring recommendations given effect).

With respect to tenure and sabbaticals, the faculty is also without influence. First, there is no tenure for faculty at the college. With the exceptions of a few two-year contracts offered at the discretion of the administration, faculty contracts are for one year. Furthermore, these contracts contain a provision giving the College broad leeway in terminations. If faculty members refuse to obey college rules and regulations prescribed by the president, or refuse to continue to promote scholarship, as prescribed by the president, then sufficient cause exists for termination of their contracts. The absence of tenure speaks to the question of faculty input. Its absence removes an area in which the faculty could have theoretically had input. *Compare Yeshiva*, 444 U.S. at 677 n. 5, 100 S.Ct. at 859 n. 5 (no grant of tenure ever made over faculty opposition). Furthermore, an absence of tenure tends to indicate to this Court that the faculty is non-managerial.[2] Without the security of tenure it would seem less likely that faculty members would attempt to assert managerial authority on matters in contradiction to an administration armed with the power of termination.

In regard to sabbaticals, the faculty at Florida Memorial has not exercised any influence in the process. While the College has granted only one sabbatical in its history, the decision to do so was reached by the Board of Trustees based upon recommendations from the president and academic dean.

Similarly, decisions at the College concerning termination and promotion are largely under the control of the administration. With respect to termination or non-renewal of faculty contracts, the president and the academic dean play the predominant roles. In 1978, for instance, the president unilaterally decided not to renew the

---

**2.** In *Yeshiva*, the Court mentioned the question of tenure but stated that it was not expressing an opinion on this issue. The Court said "[i]t may be that a rational line could be drawn [in terms of the managerial status of faculty] between tenured and untenured faculty members, depending upon how a faculty is structured and operates." 444 U.S. at 690 n. 31, 100 S.Ct. at 866 n. 31. We believe the existence of tenure, or the lack thereof, is a valid criterion to be considered in terms of the issue in this case.

contracts of four faculty members without advanced notice. Thereafter, the president asserted to the Academic Council his authority to do so as a privilege of his office.

In terms of promotions, the academic dean is responsible for making determinations. The academic dean has both accepted and rejected faculty chairpersons' recommendations in this process. *Compare N.L.R.B. v. Cooper Union,* 783 F.2d at 32 (faculty non-managerial where faculty tenure and promotions have frequently been rejected) *with N.L.R.B. v. Lewis University,* 765 F.2d at 623 (faculty managerial where president vetoed only five of 118 faculty recommendations for tenure and promotions).

Finally, the Court in *Yeshiva* relied on the fact that faculty views on occasions had determined the size of the student body, the tuition to be charged, and the location of a school. At Florida Memorial each of these matters is determined by the administration which is solely responsible for establishing admissions policies and tuition, and which was responsible for establishing and locating the College's satellite facilities.

In sum, the record amply supports the Board's conclusion in this case that the faculty at Florida Memorial failed to meet the relevant criteria under *Yeshiva* and its progeny. Accordingly, the Board reasonably found that the faculty was not managerial and therefore not excluded from the application of the Act.

The second question at issue in this case was not before the Court in *Yeshiva,* 444 U.S. at 682, 100 S.Ct. at 862. It concerns, in part, the supervisory status of certain faculty members. The Board found that the College faculty division chairpersons and the College's two dormitory resident managers exercised insufficient supervisory authority to be considered supervisors under the Act. Recognizing the great deference awarded to the Board's decision when its conclusions are rationally based on articulated facts and consistent with the Act, *Beth Israel Hospital v. N.L.R.B.,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); *T.R.W. Greenfield Div.*

*v. N.L.R.B.,* 716 F.2d 1391, 1395 (11th Cir. 1983), we uphold the Board's decision on this matter.

In regard to the division chairpersons, the record indicates that their limited authority falls short of the level required to establish supervisory status. Their roles in the promotion and wage increase process, as well as their authority to resolve grievances and evaluate faculty members is effectively and frequently circumscribed by the administration. The Board's finding that the responsibilities of the division chairpersons incident to their normal faculty positions did not amount to supervisory as envisioned by the Act is supported by substantial evidence. *Adelphia University,* 195 N.L.R.B. 639, 643–44 (1972); *Mount Vernon College,* 228 N.L.R.B. 1237, 1238 (1977).

Furthermore, in regard to the resident managers, the Board also properly concluded that such persons were not supervisors under the Act. Here, too, their supervisory role is de minimis and is tempered by an administration which holds tight reins over their authority. *Id.*

The Board's order will be ENFORCED.