866 F.2d 157
 130 L.R.R.M. (BNA) 2374, 110 Lab.Cas. P 10,916,
51 Ed. Law Rep. 445
 DAVID WOLCOTT KENDALL MEMORIAL SCHOOL a/k/a Kendall School
of Design, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
Kendall Faculty Association, MEA/NEA, Intervenor.
 Nos. 87-5381, 87-5462.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 18, 1988.
Decided Jan. 18, 1989.
 
 Jack R. Clary, Clary, Nantz, Wood, Hoffius, Rankin and Cooper, Robert C. Stone, Lead Counsel (argued), Douglas W. Van Essen, Grand Rapids, Mich., for petitioner, cross-respondent.
 Harvey I. Wax, M. Catherine Farrell, Levin, Levin, Garvett & Dill, Southfield, Mich., for intervenor.
 Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Judith Dowd (argued), Washington, D.C., Barbara A. Atkin, Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for respondent, cross-petitioner.
 Mitchell E. Roth, Washington, D.C., for intervenor Kendall Faculty Assoc., MEA/NEA.
 Before MERRITT, KRUPANSKY and BOGGS, Circuit Judges.
 KRUPANSKY, Circuit Judge.
 
 
 1
 This case is before the court on the petition of David Wolcott Kendall Memorial School, a.k.a. Kendall School of Design (Kendall), a four-year college located in Grand Rapids, Michigan, which specializes in art, architecture, and design with an enrollment of approximately 500 students and a teaching staff of approximately 20 full-time, 20 part-time, and various adjunct and visiting faculty members, to review and set aside an unfair labor practice order of the NLRB (the Board) issued against it on March 20, 1987. The Board has filed a cross-application for enforcement of its order.
 
 
 2
 The case involves the Board's determination and order that Kendall unlawfully refused to bargain with a representative of its faculty and thereby committed an unfair labor practice in violation of the NLRA. The instant controversy arose when Kendall in May, 1980 withdrew recognition of the Kendall Faculty Association MEA/NEA ("the Association") as the exclusive bargaining representative of the faculty on the basis that the Kendall faculty were "managerial employees" and not covered by the NLRA. Kendall relied on NLRB v. Yeshiva Univ., 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). According to settled precedent, if Kendall's faculty are properly characterized as managerial, they should have been excluded from the bargaining unit (unit) and Kendall would not have had the duty to bargain with it.
 
 
 3
 In response, the Association filed unfair labor practice charges with the Regional Director of the Department of Labor. The Director decided to issue an unfair labor practice complaint.
 
 
 4
 On October 9, 1981, Kendall filed a petition seeking to clarify the unit by excluding all managerial employees. After 17 days of hearings, the Regional Director transferred the unit clarification petition directly to the Board for decision pursuant to Rule 102.67(h) of the Board's rules and regulations. While the unit clarification petition was pending before it, the Board issued opinions interpreting the Yeshiva decision. Because the instant case was no longer novel, the Regional Director, at the invitation of the Board, ordered that the case be returned to him for decision.[1] The Regional Director stayed the unfair labor practice complaint pending his decision on the unit clarification petition.
 
 
 5
 On December 28, 1982, the Regional Director found that Kendall faculty members were not managerial employees and dismissed the unit clarification petition. In February, 1983, Kendall requested review of the dismissal of the petition which the Board granted on June 14, 1983 with the proviso that its result would be limited to determining the "managerial" status of faculty members. In April, 1986, the Board affirmed the Regional Director's earlier decision. It concluded that any errors attributable to the decision of the Regional Director were harmless.
 
 
 6
 After the Board confirmed the Regional Director's dismissal of the unit clarification petition, the General Counsel again pursued the unfair labor practice complaint. On November 28, 1986, the proceeding was transferred to the Board and on March 20, 1987, the Board concluded that all material issues had been previously litigated and the general counsel's motion for summary judgment was granted and Kendall's motion denied. The Board then ordered the school to bargain with the Union and to cease and desist from further unfair labor practices.
 
 
 7
 From these rulings, Kendall appealed to this court and the general counsel cross-petitioned for enforcement of the Board's decision.
 
 
 8
 Initially, it is noted that the Board has broad authority, delegated to it by Congress, to determine the constituency of the employee collective bargaining unit. Section 9(b) of the Act, 29 U.S.C. Sec. 159(b); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); Maccabees Mutual Life Ins. Co. v. NLRB, 757 F.2d 767, 769 (6th Cir.1985). "The parameters of our scope of action are restricted," Boston U. Chapter, Amer. Assoc. of Univ. Prof. v. NLRB, 835 F.2d 399, 401 (1st Cir.1987), because the Secretary's ruling is entitled to deference if it is supported by substantial evidence and has a reasonable basis in law. Id. In construing the scope of the NLRA, this court "must accord great respect to the expertise of the Board." Loretto Heights College v. NLRB, 742 F.2d 1245, 1255 (10th Cir.1984). The Board's determination must be upheld unless it is "arbitrary, unreasonable or an abuse of discretion." NLRB v. American Seaway Foods, Inc., 702 F.2d 630, 632 (6th Cir.1983).
 
 
 9
 The term "employee" is broadly defined in Section 2(3) of the NLRA, 29 U.S.C. Sec. 152(3) to include "any employee." See Angel, Professionals and Unionization, 66 Minn.L.Rev. 383, 417 (1982) ("Congress intended to broadly define the term employee"). Professional employees are specifically included within the coverage of the NLRA under section 2(12), and faculty members employed at institutions of higher learning have long been considered "professional employees" protected by the Act. C.W. Post Center of Long Island Univ., 189 N.L.R.B. 904, 905 (1971). The Supreme Court has carved out a narrow exception to that rule in NLRB v. Yeshiva Univ., 444 U.S. at 672, 100 S.Ct. at 857 (some faculty members may be "managerial" and thus excluded from NLRA coverage).
 
 
 10
 Because managerial employees are not excluded from coverage under the NLRA by any express language, but rather by an implied exception to the statute, see NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-90, 94 S.Ct. 1757, 1761-70, 40 L.Ed.2d 134 (1974), the exception must be narrowly construed to avoid conflict with the broad language of the Act, which covers "any employee," including professional employees. See The Managerial Status of Faculty Members Under the NLRA, 94 Harv.L.Rev. 251, 256-61 (1980) (Yeshiva must be narrowly construed to prevent emasculation of Board's policy of including professionals under the NLRA).
 
 
 11
 According to Yeshiva, the effect of faculty participation in the "academic affairs" of a university on the determination of their "managerial" status is to be evaluated by reviewing the faculty's role in effectively formulating the university's curriculum, departmental budgeting and funding, grading systems, admissions and matriculation standards, academic calendars, size of the student body, tuition and, in some instances, the geographical location of the institution. Collateral criteria for consideration by the court include the faculty's participation in and contribution to faculty hiring, promotions, tenure, sabbaticals, and termination.
 
 In essence, according to Yeshiva:
 
 12
 To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and customers who will be served.
 
 
 13
 100 S.Ct. at 864.
 
 
 14
 Although Yeshiva does not mandate that faculty authority in academic affairs be absolute it admonishes that:
 
 
 15
 employees whose decision-making is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty. Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management.
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 It is plain, for example, that professors may not be excluded [from the bargaining unit] merely because they determine the content of their own courses, evaluate their own students, and supervise their own research.
 
 
 19
 100 S.Ct. at 866.
 
 
 20
 This court is, pursuant to Yeshiva, mandated to undertake "a factually based assessment of the control and authority actually asserted by faculty members." 1979-1980 Annual Survey of Labor Rel. and Employment Discrim. Law, 22 B.C.L.Rev. 40, 53 (1980). Thus, the crucial issue is the extent to which the faculty is involved in decisionmaking beyond their own classrooms. Sussman, Univ. Governance Through a Rose-Colored Lens: NLRB v. Yeshiva, 1980 Sup.Ct.Rev. 27, 46.
 
 
 21
 Yeshiva instructs that since "the business of a university is education," Yeshiva, 444 U.S. at 688, 100 S.Ct. at 865, this court must focus its attention on "the faculty's role in academic affairs in order to determine the question of managerial status." Loretto Heights College, 742 F.2d at 1252. "An administration's systematic deference to faculty wishes is probably the most significant criterion used by the Board to determine that faculty are managerial employees." See Lee and Begin, Criteria for Evaluating the Managerial Status of College Faculty: Application of Yeshiva University by the N.L.R.B., 10 J.Coll. and Univ.Law 515, 536 (1983-84).
 
 
 22
 Juxtaposing the faculty's authority in the instant action with the standards enunciated in Yeshiva, this court is satisfied that the Board's factual findings are correct and certainly not clearly erroneous in that the faculty, although vested with an appearance of authority, is actually severely limited in the authority delegated to it in the critical areas of determining curriculum, grading systems, admissions and matriculation requirements, academic calendars, size of the student body, tuition and other activities generally characterized as the "academic affairs" of a university.
 
 
 23
 The faculty's participation in budget preparation, departmental funding, site selection, faculty hiring, promotions, tenure, sabbaticals, terminations and similar "business affairs" of Kendall is equally limited.
 
 
 24
 In sum, the faculty's role in both the "academic and business affairs" of Kendall does not predominate. On the contrary, its "decision-making is limited to the routine discharge of professional duties in projects to which they have been assigned...." Yeshiva, 100 S.Ct. at 866.
 
 
 25
 In short, it is apparent from the developed evidence in the instant case that the Kendall faculty "asserts insufficient control in terms of almost every one of the relevant criteria examined by the court [in Yeshiva ]." NLRB v. Fla. Memorial College, 820 F.2d 1182, 1184 (11th Cir.1987). Accordingly, the Board's decision was supported by substantial evidence. Appellant has not proved that the faculty "in effect substantially and pervasively operate the enterprise." Yeshiva, 444 U.S. at 691, 100 S.Ct. at 867. Nor has appellant demonstrated, as in Yeshiva, that the faculty's authority in "academic matters" is predominant. 444 U.S. at 686, 100 S.Ct. at 864. Instead, the faculty in the instant case, while having been cloaked with the appearance of authority in some limited areas of decisionmaking, does not significantly or effectively participate in the operation of the enterprise to warrant its exclusion from the bargaining unit. The Board's decision that the faculty was not "managerial", is, accordingly, supported by substantial evidence and is AFFIRMED.
 
 
 26
 In addition to challenging the inclusion of faculty members as "employees," Kendall also charged that the Board's decision assigning dual status to faculty members who also serve as chairmen of various departments was erroneous. After July 1986, the General Counsel had included department chairmen in the bargaining unit only insofar as they were acting as faculty members, but excluded those individuals from the unit to the extent that they were acting as department chairmen. This unit description had long been incorporated in the parties' collective bargaining agreement, but was not adopted by the General Counsel until July, 1986. In this appeal, the Board has now conceded that the post-1986 unit description was inappropriate and that department chairmen should be included in the unit for all purposes. However, the Board correctly argued that the erroneous partial exclusion provided no defense to the school's blanket refusal to bargain from 1980 forward. From 1980-86, the Board's unit description had not included the bifurcated description of department chairmen. Nonetheless, throughout the litigation, the school had premised its withdrawal of recognition and subsequent refusal to bargain on its contention that all of the faculty members constitute managerial personnel. Nothing in the record disclosed that Kendall would have recognized and bargained with the Union even if the unit definition had after 1986 embraced all faculty members. See Adams & Westlake, Ltd. v. NLRB, 814 F.2d 1161 (7th Cir.1987) (company's defenses to unfair labor practice charge must have existed at the time of the refusal to bargain); Osteopathic Hospital Founders Ass'n v. NLRB, 618 F.2d 633, 640 (10th Cir.1980) (since employer's withdrawal of recognition of union was totally unrelated to its present assertion, in defense of refusal to bargain charge, that unit was inappropriate, court refused to accept belated challenge to appropriateness of unit).
 
 
 27
 Moreover, the discrepancy between the appropriate bargaining unit and the bifurcated description precipitated by the General Counsel's erroneous designation was inconsequential since it involved but five individuals and did not justify Kendall's refusal to bargain. See NLRB v. Gogin, 575 F.2d 596 (7th Cir.1978) (variance between unit requested by union, "all drivers," and unit found appropriate by the Board, "all drivers including helpers," was a minimal variance insufficient to justify the Company's refusal to bargain). See also NLRB v. Midvalley Steel Fabricators, Inc., 621 F.2d 49, 53 n. 3 (2d Cir.1980) (court refusal to dismiss unfair labor practice claim despite inappropriateness of bargaining unit; employer did not show that it refused to bargain because the bargaining unit was inappropriate).
 
 
 28
 Pursuant to its inherent authority, this court may modify the Board's order to direct Kendall to bargain with the appropriate bargaining unit, i.e., one including "all teaching faculty." Accordingly, the Board's March 20, 1987 order (requiring Kendall to bargain with all faculty, excluding department chairmen acting in their capacity as chairmen) is hereby amended to order Kendall to bargain with "all teaching faculty excluding office employees, maintenance personnel and supervisors," as the Board has requested. Cf. Medallion Kitchens, Inc. v. NLRB, 811 F.2d 456 (8th Cir.1987) (circuit court has authority to modify NLRB order); Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60 (2d Cir.1979) (same); NLRB v. Allis-Chalmers Corp., 563 F.2d 674 (5th Cir.1977) (same).[2]
 
 
 29
 Accordingly, the Board's decision was supported by substantial evidence and is ENFORCED. The order will be modified to include "all faculty" in the bargaining unit.
 
 
 
 [1]
 Kendall contended that the Regional Director could not impartially adjudicate the unit clarification proceeding because he had already issued a complaint in the pending unfair labor practices proceeding. Kendall argued that the earlier unfair labor practices complaint indicated that the director was pre-disposed against Kendall's bargaining unit clarification petition. However, an administrator is not presumed to be biased merely because he filed a complaint and then presides over an adversary hearing. See Withrow v. Larkin, 421 U.S. 35, 36, 95 S.Ct. 1456, 1459, 43 L.Ed.2d 712 (1975); NLRB v. Richard W. Kaase Co., 346 F.2d 24, 28 (6th Cir.1965)
 
 
 [2]
 Appellant also challenged the inclusion of both full and part time faculty in the voting unit. However, the record discloses that full and part time faculty share a "community of interest" which would allow them to both be properly included in the same unit. No distinction is made between part and full-time faculty with regard to (1) membership in the credit union; (2) liability insurance; (3) workers' compensation insurance; (4) voting status in the faculty forum; (5) participation in Social Security; and (6) election and appointment to school committees. Part-time faculty are given the same sick leave and medical insurance as full-time faculty, prorated for the number of hours worked. Accordingly, full and part-time faculty may be included in the same unit. Kendall College v. NLRB, 570 F.2d 216, 219 (7th Cir.1978)