**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

NATIONAL LABOR RELATIONS
BOARD,

     Petitioner,

v.

WOLF CREEK NUCLEAR OPERATING
CORPORATION,

     Respondent.

No. 18-9521
(NLRB No. 14-CA-181053)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

In 2016, the International Brotherhood of Electrical Workers, Local 225 (the

Union) filed a petition with the National Labor Relations Board (the Board) seeking to

represent certain purchasing employees of Wolf Creek Nuclear Operating Corporation,

Buyers I, II, and III, and the Lead Buyer (the Buyers). Wolf Creek opposed the Union's

petition, claiming the Buyers were managerial employees—as decided by a previous

Regional Director's decision in 2000—and therefore were excluded from coverage under

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the National Labor Relations Act (the Act). After a series of appeals and remands, the Regional Director concluded there had been material changes in circumstances that warranted relitigating the Buyers' managerial status and, upon reconsideration, found the Buyers were nonmanagerial employees. Consistent with the Board's decision, the Buyers voted on and approved representation by the Union.

Wolf Creek refused to bargain with the Union on behalf of the Buyers. As a result, the Board found Wolf Creek had engaged in unfair labor practices, in violation of sections 8(a)(1) and (a)(5) of the Act. The Board then filed an enforcement application with this court. Wolf Creek opposes enforcement, arguing the 2000 decision should have been given res judicata effect and that the Buyers are managerial employees. Reviewing for substantial evidence, we conclude the Regional Director's findings of changed circumstances and nonmanagerial status were supported. Therefore, exercising jurisdiction under 29 U.S.C. § 160(e), we GRANT the application for enforcement.

## I.     BACKGROUND

### A.  *Factual History*[1]

The Buyers procure all goods and services, except nuclear fuel, for Wolf Creek. To qualify as a Buyer, an individual must meet a combination of educational and professional criteria, with higher levels of both required for each successive level of Buyer—Buyer I, Buyer II, Buyer III, and Lead Buyer. The Buyers are required to train

---

[1] This factual history is taken from the Regional Director's decisions: Decision & Direction of Election, No. 14-RC-168543 (Feb. 16, 2016) [hereinafter 2016 Decision], and Supplemental Decision, No. 14-RC-168543 (May 9, 2017) [hereinafter 2017 Decision]. We address Wolf Creek's challenge to these findings in the discussion section.

for and receive certifications from the Institute of Supply Management and to keep current with continuing education requirements. Wolf Creek pays for the initial training and certification and offers classes to cover the continuing education requirements. All Buyers report to a supervisor and none of the Buyers supervise any other employee.

Wolf Creek has adopted an Administrative Control Procedure (ACP) that establishes guidelines for procuring materials. The ACP applies not only to the Buyers but also to other employees involved in the procurement process. The procurement process also utilizes EMPAC, a computer system designed to streamline purchases. To put the parties' arguments in context, we provide a brief overview of the procurement process at Wolf Creek.

The procurement process begins when an employee sends a requisition to the purchasing department via EMPAC. The requisition includes the item requested, the quantity needed, the item's authorized purchase price, and previous purchase prices. All requisitions must be submitted by an employee with purchasing authority and authorized by a supervisor or manager from the requesting department. Management assigns employees different levels of purchasing authority. The Buyers are not involved in creating requisitions or authorizing employees to submit requisitions.

After the requisition is submitted, the Buyers' supervisor assigns the requisition to a Buyer based on the type of item requested. The Buyer's purchasing authority for the requisition is dictated by the requestor's level of purchasing authority. The Buyer has no authority to purchase without a proper requisition and may not exceed the requestor's

purchasing authority. The Buyer is responsible for ensuring there is proper authorization before completing any purchase.

The Buyer's first step after receiving a requisition is to determine whether the item should be competitively bid. Competitive bidding is required for purchases expected to exceed $50,000, if multiple approved suppliers of the item exist. The Buyers have the discretion to, and often do, competitively bid purchases under $50,000.

Once the Buyer chooses to competitively bid an item, the ACP requires "the Buyer [to] determine[] the suppliers from whom to solicit bids, based on commercial, technical, and/or quality considerations." 2016 Decision at 5. Generally, the Buyer will begin by generating a list of potential suppliers from EMPAC, which will include the Original Equipment Manufacturer and prior suppliers. If the item is safety-related, the Buyer is required to use suppliers from a specific pre-approved list.

After compiling the list of potential suppliers, the Buyer uses EMPAC to generate a Request for Quotation (RFQ) and sends the RFQ to potential suppliers. EMPAC allows the Buyer to populate the RFQ form with standard clauses and information. If a supplier requests an exception to a safety-related RFQ, the Buyer is required to seek the procurement engineer's approval for the exception. Where the exception is not safety-related, the Buyer will generally seek approval from the requestor, although the Buyer is not required to do so.

Once the Buyer receives the bids, the Buyer enters the information into EMPAC so EMPAC can perform a bid analysis. Generally, the Buyer selects the lowest bidder, but can consider delivery time, cost of freight, and safety concerns. In selecting the

4

winning bid, the Buyer can rely on his or her "background, experience, training, certifications, and knowledge." *Id.* at 6. If the Buyer does not select the lowest bid, the Buyer must enter the reason into EMPAC.

Regardless of whether the item was competitively bid, if the purchase price exceeds the original requisition price, but by less than $1,000 per line item, the Buyer has authority to make the purchase. If the price is more than $1,000 per line item over the original requisition price, the Buyer must receive authorization from the requestor.

After a supplier is selected, the Buyer uses EMPAC to draft a purchasing order. EMPAC allows the Buyer to select terms and conditions for the purchasing order and EMPAC then issues the order. EMPAC warns the Buyer if terms and conditions are missing from the purchasing order, but the Buyer can choose to issue the purchasing order anyway. EMPAC also requires the Buyer to confirm the Buyer has funding approval before creating the purchasing order. By issuing the purchasing order, the Buyer commits Wolf Creek's funds for the purchase.

After submitting purchasing orders, the Buyer's final responsibility is to arrange shipping. The Buyer may select the freight carrier, but the Buyer is often restricted by alliance agreements[2] with other plants. The Buyer is not responsible for negotiating those agreements.

---

[2] Wolf Creek enters into alliance agreements with other power plants that specify preferred suppliers for purchases ranging from freight to gaskets to electrical purchases in exchange for better rates.

## B. *Procedural History*

In 2000, the Regional Director issued a decision in case number 17-UC-210 in which it granted Wolf Creek's petition to clarify the existing bargaining unit and to exclude the Buyers as managerial employees. Decision, Order & Clarification of Bargaining Unit at 22–23, No. 17-UC-210 (May 4, 2000) [hereinafter 2000 Decision]. The Union did not appeal the 2000 Decision to the Board.

Sixteen years later, in 2016, the Union[3] filed a petition with the Board seeking to represent the Buyers as part of the bargaining unit, thereby initiating case 14-RC-168543. The Regional Director concluded he was not required to give res judicata effect to the 2000 Decision because "the Board did not make an official or final ruling on the issue." 2016 Decision at 2–3. Considering the issue anew, the Regional Director found the Buyers were not managerial employees and could be part of the bargaining unit. He therefore directed that a secret ballot election be held for the Buyers to decide if they wanted to be represented by the Union. The Buyers voted to join the Union.

Wolf Creek requested Board review of the Regional Director's refusal to give res judicata effect to the 2000 Decision and his conclusion that the Buyers were not managerial employees. On review, the Board ruled the 2000 Decision was final for preclusion purposes and would have preclusive effect "unless the party seeking relitigation of the previously decided issue satisfies its burden of presenting new factual

---

[3] The Union changed from Local 304 in 2000 to Local 225 in 2016. The parties do not discuss this change, and we therefore presume it has no effect on the *res judicata* analysis.

circumstances that would vitiate the preclusive effect of the earlier ruling." *Wolf Creek Nuclear Operating Corp. & Int'l Bhd. of Elec. Workers, Local 225*, 365 N.L.R.B. No. 55, at 1–2 (Apr. 7, 2017) [hereinafter 2017 Remand Order]. The Board remanded the case to the Regional Director to consider whether there was a sufficient change in circumstances to warrant revisiting the Buyers' managerial status.

On remand, the Regional Director reopened the record and concluded there had been a material change in circumstances sufficient to warrant reconsidering the Buyers' managerial status. He thus refused to give preclusive effect to the 2000 Decision. The Regional Director also reaffirmed the 2016 Decision's conclusion that the Buyers were not managerial employees.

Wolf Creek again sought Board review, but the Board denied the request because "[Wolf Creek] raises no substantial issues warranting review." Order, No. 14-RC-168543 (Oct. 27, 2017) [hereinafter 2017 Denial Order]. In a footnote, however, the Board noted its agreement with the decision not to give preclusive effect to the 2000 Decision.

In July 2016, the Union filed a charge alleging Wolf Creek had engaged in unfair labor practices by refusing to bargain with the Union despite the Union's certification as the collective bargaining representative for the Buyers. *Wolf Creek Nuclear Operating Corp. & Int'l Bhd. of Elec. Workers, Local 225*, 366 N.L.R.B. No. 30, at 1–2 (Mar. 13, 2018) [hereinafter 2018 Decision]. Based on that charge, General Counsel for the NLRB filed a complaint in November 2017 alleging Wolf Creek was in violation of sections 8(a)(1) and (a)(5) of the Act. The Board concluded Wolf Creek improperly refused to bargain and granted summary judgment to the General Counsel. Pursuant to 29 U.S.C.

7

§ 160(e), the Board filed an application with this court for enforcement of the 2018

Decision.[4]

## II.    DISCUSSION

Wolf Creek opposes the application for enforcement, challenging both the

conclusion that there was a material change in circumstances and the conclusion that the

Buyers are nonmanagerial employees. We begin by discussing three relevant standards:

(1) the general standard of review governing an application for enforcement; (2) the

standard for determining whether an employee falls within the managerial exclusion of

the Act, and; (3) the standard dictating when the Board can revisit a prior final order. We

then address the Regional Director's finding of a material change in circumstances

permitting reconsideration of the 2000 decision. Concluding that there were material

changes in circumstances, we next discuss the Regional Director's finding that the

Buyers do not fall within the managerial exclusion.

### A.   *General Standard of Review*

"In reviewing an NLRB order, we grant enforcement if we find that the Board

correctly interpreted and applied the law, and if its factual findings are supported by

---

[4] Wolf Creek's challenge in this case is limited to the determinations made in the 2016 Decision and 2017 Decision. Board certification proceedings normally "are not directly reviewable in the courts" unless "the dispute concerning the correctness of the certification eventuates in a finding by the Board that an unfair labor practice has been committed as, for example, where an employer refuses to bargain with a certified representative on the ground that the election was held in an inappropriate bargaining unit." *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–77 (1964). In reviewing an unfair labor practice determination, as we do here, the Act provides for full judicial review of the prior certification decision. *Id.*

8

substantial evidence in the record as a whole." *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993); *see also* 29 U.S.C. § 160(e) (mandating the Board's factual findings are conclusive if "supported by substantial evidence on the record considered as a whole"). "As to questions of law, we generally afford the Board's determinations great weight, and uphold their determinations if within reasonable bounds." *Greater Kan. City Roofing*, 2 F.3d at 1051 (internal quotation marks omitted).

As to factual findings, "[t]he scope of judicial review of an NLRB record on an enforcement application compels careful consideration of all of the evidence, including whatever fairly detracts from the Board's findings and conclusions." *NLRB v. J.D. Indus. Insulation Co.*, 615 F.2d 1289, 1292 (10th Cir. 1980). But the substantial evidence test gives the NLRB "the benefit of the doubt" and "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 377 (1998). We may not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We must respect the Board's findings unless we "cannot conscientiously find that the evidence supporting that decision is substantial." *Id.*

### B. *Standard for Determining Whether Employees Are Managerial*

Managerial employees are not expressly excluded from coverage under the Act. *See NLRB v. Yeshiva Univ.*, 444 U.S. 672, 682 (1980). But there is a "judicially implied exclusion for 'managerial employees' who are involved in developing and enforcing

employer policy." *Id.* This exclusion grew out of the concern "[t]hat an employer is entitled to the undivided loyalty of its representatives." *Id.* In recognizing the exclusion, the Supreme Court noted the Act's legislative history, which "strongly suggests that there also were other employees, much higher in the managerial structure, who were . . . regarded as so clearly outside the Act that no specific exclusionary provision was thought necessary." *NLRB v. Bell Aerospace Co., Div. of Textron, Inc.*, 416 U.S. 267, 283 (1974).

"[T]he question whether particular employees are 'managerial' must be answered in terms of the employees' actual job responsibilities, authority, and relationship to management." *Id.* at 290 n.19.

> Managerial employees are defined as those who "formulate and effectuate management policies by expressing and making operative the decisions of the employer." These employees are "much higher in the managerial structure" than those explicitly mentioned by Congress, which "regarded [them] as so clearly outside the Act that no specific exclusionary provision was thought necessary." Managerial employees must exercise discretion within, or even independently of, established employer policy and must be aligned with management. Although the Board has established no firm criteria for determining when an employee is so aligned, normally an employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy.

*Yeshiva Univ.*, 444 U.S. at 682–83 (alteration in original) (citations omitted) (quoting *Bell Aerospace*, 416 U.S. at 288, 283, 286–87). Managerial employees include "'those who formulate, determine, and effectuate an employer's policies,' and those who have discretion in performance of their jobs, but not if th[at] discretion must conform to an employer's established policy." *Bell Aerospace*, 416 U.S. at 288 n.16 (citation omitted) (quoting *Retail Clerks Int'l Ass'n v. NLRB*, 366 F.2d 642, 645 (D.C. Cir. 1966)).

## C. *Standard for Determining Whether the Board Can Reconsider a Prior Ruling*

The Board "has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Service*, 522 U.S. at 374. And its adjudication is subject to the same requirement of reasoned decisionmaking as applies to rulemaking. *Id.* Therefore, the Board "must be required to apply in fact the clearly understood legal standards that it enunciates in principle." *Id.* at 376.

The Board "explicitly held that Board decisions and rulings in representation cases have preclusive effect in subsequent representation cases." 2017 Remand Order at 1. The party seeking relitigation of the issue (here, the Union) has the "burden of presenting new factual circumstances that would vitiate the preclusive effect of the earlier ruling." *Id.* at 2. This burden is not, however, "an onerous one," as it merely requires pointing to "one material differentiating fact." *Id.* at 3 n. 7 (quoting *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1319 (11th Cir. 2012)). To overcome the preclusive effect of a prior decision, "circumstances [must] have changed in a way that would materially alter the analysis of the [B]uyers' managerial status." *Id.* at 3. So, it is necessary to "examine any factual changes in context and in light of the relevant statutory question." *Id.* We undertake that analysis now.

## D. *Material Change in Circumstances*

The Regional Director concluded there were three material changes in circumstances that warranted overcoming res judicata and relitigating the Buyers' managerial status. We begin by discussing Wolf Creek's specific challenges to each of

11

the changes in circumstances. We then address whether those changes overcome the res judicata effect of the 2000 Decision.

**1. Substantial Evidence Supporting Changes**

The three material changes found by the Regional Director to warrant relitigation of the Buyers' managerial status are that: (1) changes to EMPAC altered the Buyers' role in the procurement process, (2) Wolf Creek reduced the frequency of competitive bidding, and (3) the Buyers are less involved in evaluating responses to RFQs. Wolf Creek challenges each of these material changes. In this section, we first consider Wolf Creek's challenges to each change individually, including specifically whether there is substantial evidence to conclude the change exists. In the following section, we discuss whether these changes were material and warranted relitigating the Buyers' managerial status.

a. *Updates to EMPAC*

The first material change in circumstances identified by the Regional Director was the technological upgrades to EMPAC. The Regional Director recognized that "standing alone, technological changes are insufficient to establish material changes to a job classification." 2017 Decision at 6. But the Regional Director focused on how EMPAC's evolution allows Wolf Creek to "integrate its procurement procedures and its procurement software, and thus, regulate and restrict the [B]uyers' discretionary actions." *Id.* The Regional Director noted, "information that was once available only in the mind of a seasoned buyer or maintained in hardcopy" is now readily accessible to the Buyers and other employees. *Id.* at 7. And EMPAC now has pop-up warnings with procurement

12

policies and assists the Buyers "in including necessary clauses in an RFQ or purchase order." *Id.* The Regional Director also found that EMPAC performs some functions for which the Buyers were previously responsible, such as analyzing and calculating bids and shipping terms. As a result of these changes, the Regional Director found the Buyers' "role as one of the final gatekeepers in the procurement process has been diminished." *Id.* The Regional Director concluded that "changes to the EMPAC system, largely a result of technical innovation, have fundamentally limited the [B]uyers' discretion" and constitute a material change in circumstances. *Id.* at 6.

Wolf Creek does not argue the record lacks substantial evidence to support the Regional Director's findings regarding changes to EMPAC; Wolf Creek effectively acknowledges those changes exist. Instead, Wolf Creek asserts the Regional Director's determination is erroneous because "the Board has long held that advances in technology are generally insufficient to warrant a change in managerial status." Wolf Creek's Br. at 24. And Wolf Creek contends the Regional Director failed to consider these changes against the criteria for evaluating managerial status—"the underlying nature of the job and the independent discretion maintained in the position." *Id.* Under that criteria, Wolf Creek contends that "[t]he source of information is irrelevant," *id.*, and the rules built into EMPAC "have always been in place and the Buyers have always been responsible for following them," *id.* at 25–26.

At least one of the Board members agreed with Wolf Creek's position. In denying review of the 2017 Decision, one Board member noted he did not find the changes in EMPAC material because they "merely automated certain functions and reminded Buyers

13

of preexisting boundaries of their discretionary authority without actually further diminishing that authority." 2017 Denial Order at n.1.

Because the Regional Director found two additional material changes in circumstances, we need not address whether the changes to EMPAC, standing alone, could provide substantial evidence of a material change in circumstances. Indeed, we need not consider the EMPAC changes in our analysis at all because, as we now discuss, substantial evidence supports the other material changes found by the Regional Director, and those changes warrant relitigation of the Buyers' managerial status.

b. *Reduction in competitive bidding*

Separate from the changes to EMPAC, the Regional Director found a material change in circumstances in the decreased use of competitive bids and, correspondingly, the Buyers' discretion. While the Regional Director recognized competitive bidding is still part of the Buyers' duties, he emphasized the decline in that practice based on Wolf Creek's increased use of single-source suppliers.

According to Wolf Creek, the Buyers are still responsible for deciding whether to competitively bid an item and for the competitive bidding process. Wolf Creek also notes that some items, such as safety-related items, have never been appropriate for competitive bidding. But Wolf Creek concedes that "the number of purchases subject to competitive bidding has declined." Wolf Creek's Br. at 27. And there is substantial evidence in the record to support the Regional Director's finding of a significant decrease in competitive bidding.

14

While the record does not indicate the percentage of procurements previously subjected to competitive bidding, in 2000 the Regional Director noted there were only "limited situations" where items over $5,000 were not competitively bid. 2000 Decision at 20. By 2017, only about 10% of all purchase orders were competitively bid. A Buyer who began in 1997 testified that the amount of competitive bidding has progressively declined.

Testimony also indicates that multiple factors impacted this decline. First, Wolf Creek's plant is now more than thirty years old and often only a single company still sells the specific equipment needed. Second, with respect to safety-related items, the Buyers can seek bids only from approved suppliers, and there is often just a single approved supplier for the item.[5] Finally, Wolf Creek has negotiated several alliance agreements that encourage purchasing items from a designated supplier.

In short, there is substantial evidence in the record supporting the Regional Director's conclusion that there was a significant decrease in competitive bidding after the 2000 Decision.

c. *Reduced involvement in RFQ process*

Finally, the Regional Director found that the Buyers are less involved in evaluating responses to RFQs and in selecting the ultimate supplier than in 2000. Except for routine or low-cost purchases, the Buyers now "customarily consult with the

---

[5] In 2000, the Buyers were also limited to approved suppliers for safety-related items. But there is no indication in the 2000 Decision that safety-related items often had only one approved supplier.

requisitioning department, the procurement engineering department, or a manager to identify a preferred supplier." 2017 Decision at 8.

To challenge this finding, Wolf Creek argues the Buyers are still involved in evaluating responses to RFQs and in making the ultimate decision to award a purchase to a supplier. Wolf Creek also contends that while the Buyers do frequently consult with others, this process has not changed since 2000. In support, Wolf Creek cites to the testimony of a Buyer who admits that purchasing safety-related items has always been governed by special procedures. Nothing in the cited testimony, however, discusses evaluating responses to RFQs or consulting with other departments during that process.

We have not located, and Wolf Creek has failed to point us to, any evidence that the Buyers in 2000 routinely consulted with other departments when selecting a winning bid outside of the safety-related context. In 2000, the Regional Director found the Buyers "perform[ed] a commercial evaluation to determine the most beneficial bid based on price, delivery, performance schedule, payment terms, warranties, exceptions, etc." 2000 Decision at 21. At that time, the Buyers used a bid evaluation template to list the pertinent attributes side-by-side and selected the best option. The Buyers then selected the winning bidder without seeking prior approval, even for safety-related items. Notably absent from the Regional Director's 2000 ruling is any mention of the Buyers consulting with anyone before making the decision.

Conversely, there is significant testimony from the Buyers in the 2016 and 2017 proceedings establishing that they now routinely consult with others when evaluating bids. For example, there are many purchases that require the Buyers to check with system

16

engineering to ensure the response to the RFQ will meet its needs. Other times, the Buyer will confer with the requestor about the bids and the necessary timelines. In response to the general question, "when you do competitive bidding, it is up to the Buyer to make the decision who won the bid, right?" a Buyer responded, "Well, I -- I'd say we consult the requestor." Tr. at 329.

Another Buyer testified regarding when the Buyers will select the winning bid without input from others. That Buyer explained there are certain technical purchases that require the requesting department to review the bids and assess the technical requirements, the quality, the price, and the timeframe to determine which bid to accept. But there are certain routine or low-cost purchases where the Buyer will simply choose the lowest bid or a slightly higher bid that ships faster. Frequently, even those decisions are run through the Buyer's superior. And the Buyer will often go back to the requestor before making those decisions.

Admittedly, there is some contradictory testimony. A recently retired Buyer testified about performing commercial bid evaluations as a necessary part of the process. Although approval is needed to add a supplier for safety-related items, the Buyer would send out RFQs to unapproved suppliers and, if the response was favorable after a commercial evaluation, the Buyer would seek approval to add the supplier to the approved list. The Buyer also testified that the general process for evaluating responses to RFQs was substantially the same as when she started in the late 1980s.

Despite this contradictory testimony, there was ample evidence from which the Regional Director could conclude that, although not mandated by the procedures, the

17

Buyers would typically consult with superiors in the procurement department or with the requestor when awarding the bid—except for routine or low-cost purchases. We may not "displace the Board's choice between two fairly conflicting views." *Universal Camera*, 340 U.S. at 488. Thus, there is substantial evidence supporting the Regional Director's finding of a change in circumstance based on the Buyers' diminished role in evaluating RFQs.

## 2. Materiality of the Changes in Circumstance

Excluding the changes to EMPAC, we are left with the Regional Director's findings that the reduction in competitive bidding and the minimized involvement in selecting suppliers in response to RFQs were each material changes in circumstances that warranted relitigating the Buyers' managerial status. We consider each of these changes below, concluding the Regional Director's determination that they justified reconsideration of the Buyers' managerial status is supported. In reaching that conclusion, we first frame the inquiry in terms of the statutory question. We next review the 2000 Decision to assess the basis of the Regional Director's finding that the Buyers were acting as managerial employees. Then we consider each change in circumstances to determine whether the change would alter that analysis.[6]

---

[6] Although the parties do not directly address the standard of review applicable to the materiality of a change, Wolf Creek treats the substantial evidence question as distinct from the issue of whether any such change is material. *See* Wolf Creek's Br. at 23 ("While some of these alleged changes were not supported by evidence in the record, *even if they were*, they relate to changes in the manner in which Buyers perform their job duties, not to changes in the duties themselves or to the underlying nature of the Buyer positions. Changes in the manner of performing a job do not warrant reclassification if

18

### a. *The statutory question and 2000 Decision*

Whether a material change in circumstances exists must be considered "in light of the relevant statutory question." 2017 Remand Order at 3. The statutory question in this case is: Are the Buyers covered by the Act? So, the change is material if it "would materially alter the analysis of the [B]uyers' managerial status." *Id.* That analysis, in turn, involves evaluating "the employees' actual job responsibilities, authority, and relationship to management," *Bell Aerospace*, 416 U.S. at 290 n.19, to determine whether the employees "exercise discretion within, or even independently of, established employer policy and . . . [are] aligned with management," *Yeshiva Univ.*, 444 U.S. at 683.

In 2000, the Regional Director applied this analytical framework in concluding the Buyers were managerial employees. Specifically, the Regional Director noted "[t]he Buyers exercise independent discretion when they locate vendors without reliance upon pre-approved lists" and "select a vendor without supervisory approval." 2000 Decision at 23. But between 2000 and 2017, there was a material reduction in both the quantity and quality of the Buyers' exercise of that discretion. *See* 2017 Decision at 9 ("Buyers now

---

the underlying duties remain the same." (emphasis added)). Implicitly, Wolf Creek briefs the issue as a mixed question of law and fact.

We need not decide whether the materiality of a change in circumstance is a question of fact, a mixed question, or a question of law because Wolf Creek's arguments fail under even the least deferential of these standards–that applicable to a question of law. Therefore, we will assume, without deciding, that we review the materiality of a change in circumstances to determine whether "the Board correctly interpreted and applied the law," affording its legal "determinations great weight, and uphold[ing] their determinations if within reasonable bounds." *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) (internal quotation marks omitted).

only infrequently locate and select venders without first consulting a manager or members of the department responsible for a requisition. And, although in some circumstances [the B]uyers continue to make vendor decisions on routine and cheap purchases, they do so guided by [Wolf Creek's] detailed procedures and nearly always select either the lowest bidder or the supplier who can provide the materials within the requisitioning departments timeline.").

    b.  *The decrease in competitive bidding*

The decrease in competitive bidding corresponds to a decrease in the frequency with which the Buyers locate and select vendors without preapproval. Alliance agreements that specify a single supplier decrease the Buyers' discretion to locate vendors without reliance on pre-approved lists or to select a vendor without supervisory approval. And the age of the power plant often results in only one available supplier. There is no discretion involved when the Buyers award the contract to the vendor approved through an alliance agreement or the sole vendor from which the products are available. This change in circumstances relates to the Buyers' "actual job responsibilities, authority, and relationship to management," *Bell Aerospace*, 416 U.S. at 290 n.19, and to whether they "exercise discretion within, or even independently of, established employer policy and . . . [are] aligned with management," *Yeshiva Univ.*, 444 U.S. at 683. Accordingly, the decrease in competitive bidding would alter the analysis of the statutory question and is a material change.

Wolf Creek argues, however, that the admitted decrease in competitive bidding makes the Buyers more important—and able to exercise more discretion—because when

there is no competitive bidding they must ensure a fair price from the single source. But the question for purposes of revisiting the 2000 Decision is simply whether there has been a material change in circumstances that would alter the analysis, not whether the conclusion based on that analysis would change. Once a material change has been established, the impact of the change on the scope of the Buyers' discretion is relevant to the merits question concerning their status as managerial employees. The change in circumstance does not automatically result in a different outcome—it simply warrants a new look at the previous conclusion.[7] Here, the Regional Director's finding that the decrease in competitive bidding is a material change in circumstances is within reasonable bounds. And because the showing necessary to relitigate the Buyers' managerial status can be met by pointing to "one material differentiating fact," the Union

_____

[7] Wolf Creek also finds fault in the Regional Director's determination that, based on the material change in circumstances discussed above, "there are material differences between the [B]uyers' current job responsibilities and those they had in 2000." 2017 Decision at 8. The Regional Director continued: "Even though the [B]uyers remain responsible for preparing and issuing purchase orders as they did in 2000, there has been a sufficient material change in the manner in which they perform those duties to warrant reconsideration of their managerial status." *Id.*

To challenge this determination, Wolf Creek cites *Goods N' Fresh Foods, Inc.*, 287 N.L.R.B. 1231 (1988), for the proposition that "changes to the manner in which employees perform their job do not generally warrant reclassification." Wolf Creek's Br. at 28. Wolf Creek's reliance on *Goods N' Fresh Foods* is misplaced. There, the court considered whether a successor employer inherits the bargaining obligations of the predecessor employer. *Goods N' Fresh Foods*, 287 N.L.R.B. at 1234–35. Nothing in the decision stands for the proposition that the NLRB cannot reconsider managerial status where employees go from performing a task in a manner that gives them wide discretion to performing that task in a manner that gives them little to no discretion.

has met its burden. 2017 Remand Order at 3 n.7 (noting that the burden is not "an onerous one").

   c. *The Buyers' diminished role in evaluating RFQs*

The Buyers' diminished role in evaluating responses to RFQs also reflects a material decrease in the quantity and quality of the Buyers' exercise of discretion. In all but "routine or [low]-cost purchases," the Buyers now "customarily consult with the requisitioning department, the procurement engineering department, or a manager to identify a preferred supplier, rather than independently selecting the supplier." 2017 Decision at 8. When making those decisions, the Buyers are "guided by [Wolf Creek's] detailed procedures and nearly always select either the lowest bidder or the supplier who can provide the materials within the requisitioning department's timeline." *Id.* at 9. This shows not only a decrease in the frequency with which the Buyers exercise discretion in selecting vendors, but also implicates the quality of the discretion—if any—that is exercised when selecting vendors for routine or low-cost purchases.

As with the decrease in competitive bidding, the diminished role in evaluating RFQs implicates the Regional Director's reliance on "[t]he Buyers exercise [of] independent discretion when they locate vendors without reliance upon pre-approved lists" and "select a vendor without supervisory approval." 2000 Decision at 23. Thus, these changes in circumstances "would materially alter the analysis of the [B]uyers' managerial status" and are "sufficient to allow reconsideration" of that status. 2017 Remand Order at 3.

*          *          *

22

Whether considered separately or in tandem, the changes in circumstances authorized reconsideration of the Act's application to the Buyers. The decrease in competitive bidding, which Wolf Creek acknowledges occurred, is "one material differentiating fact," and the Buyers' diminished role in evaluating RFQs is another. Together, these changes in circumstances clearly freed the Regional Director from the preclusive effect of the 2000 decision.

In summary, the Regional Director's factual findings as to a material change in circumstances were "supported by substantial evidence in the record as a whole" and the legal determinations are "within reasonable bounds." *Greater Kan. City Roofing*, 2 F.3d at 1051. We therefore proceed to consider the Regional Director's determination that the Buyers are not managerial employees.

### E.   *Managerial Status*

As the Board recognized, the question at issue here is "whether the [B]uyers meet the legal definition of managerial employees"— an "ultimate fact" that must be determined by applying "governing law to a set of evidentiary facts." 2017 Remand Order at 3. So, we begin our analysis by setting out the standard of review applicable to a managerial status determination. We follow with a description of the Regional Director's decision and rationale. Next, we address Wolf Creek's specific challenges to the Regional Director's underlying factual determinations. Finally, we consider the Regional Director's ultimate finding that the Buyers were not managerial employees.

## 1. Standard of Review

The scope and applicability of the managerial employee exclusion presents a mixed question of law and fact. *See Yeshiva Univ.*, 444 U.S. at 691. When applying the proper legal standard, however, the managerial status inquiry rests on a factual analysis of "the employees' actual job responsibilities, authority, and relationship to management." *See Bell Aerospace*, 416 U.S. at 290 & n.19; *see also* 2017 Remand Order at 3 (stating question at issue "is an ultimate fact, gleaned by application of governing law to a set of evidentiary facts: whether the [B]uyers meet the legal definition of managerial employees").

The "difficult problems" intrinsic in determining whether an individual is an "employee" under the Act "are precisely 'of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole.'" *Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko*, 373 U.S. 701, 706 (1963) (quoting *Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co.*, 370 U.S. 173, 180 (1962)). As a result, "[i]n construing the scope of the Act's coverage, we must accord great respect for the expertise of the Board 'when its conclusions are rationally based on articulated facts and consistent with the Act.'" *Loretto Heights Coll. v. NLRB*, 742 F.2d 1245, 1255 (10th Cir. 1984) (quoting *Yeshiva Univ.*, 444 U.S. at 691). However, "administrators and reviewing courts must take care to assure that exemptions from [the Act's] coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996).

The party asserting the managerial employee exclusion bears the burden of proving it applies. *Cf. NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 710–11 (2001) (reaching same conclusion for supervisory employees). Thus, the inquiry here is whether the Regional Director's determination that Wolf Creek did not meet its burden of proving the Buyers are managerial employees is supported by substantial evidence.

## 2. Regional Director's Decision

In 2016, the Regional Director concluded "the Buyers do have some discretion, but their purchasing decisions are dictated by [Wolf Creek's] policies and procedures." 2016 Decision at 9. In finding an absence of discretion, the Regional Director focused on three factual determinations. First, the Regional Director found, "[t]he Buyers rely heavily on past practice to determine which suppliers they should offer RFQ[]s and, if they deviate from past practice, Buyers must provide a justification for such a departure." 2016 Decision at 10. Thus, while the Buyers exercise discretion when selecting the supplier, such discretion "takes place within the confines of Employer policy." *Id.*

Second, the Regional Director focused on the Buyers' lack of discretion in competitively bidding and issuing purchase orders. Although the "Buyers are not required to competitively bid pre-approved requisitions" under $50,000, they must work within Wolf Creek's policies and procedures when making those purchases. *Id.* Therefore, the "requisition process effectively sets the limits of Buyer discretion." *Id.* And the Buyers are required to receive additional approval from the requestor if purchases will exceed the approved requisition price by $1,000 per line item. Thus, "the Buyers can exercise this discretion, but only within [Wolf Creek's] pre-established limits." *Id.*

Third, the Regional Director considered arguments regarding the amount of money the Buyers commit and save each year. Although the Buyers committed around $21 million of Wolf Creek's funds and saved Wolf Creek over $300,000, the Regional Director found the Buyers did so while "acting within the scope of the official purchasing policies and procedures." *Id.* at 11.[8]

In the 2017 Decision, the Regional Director reaffirmed the prior conclusion that the Buyers were not managerial employees:

> I find that the [B]uyers' authority has been circumscribed by [Wolf Creek's] evolving practices and requisition and procurement policies, which have been integrated into the EMPAC software to an extent that eliminates much of the [B]uyers' independent discretion. [The] Buyers now only infrequently locate and select venders without first consulting a

---

[8] In the 2016 Decision, the Regional Director engaged in a separate analysis for whether the Buyers engaged in significant discretion and whether their interests aligned with management. The Regional Director concluded the Buyers were not aligned with management because (1) the Buyers are allowed to purchase an item only after a manager or supervisor with purchasing authority has requisitioned the item, (2) the Buyers did not attend any high level management meetings, and (3) the Buyers did not have input into the changes made to purchasing policies.

Some NLRB cases have considered discretion and alignment of interest to be part of the same analysis. *See, e.g.*, *Lockheed-California Co.*, 217 N.L.R.B. 573, 575 (1975) (concluding the buyers "do not exercise sufficient independent discretion in their jobs to truly align them with management"). But other decisions have separately considered whether an employee "is 'so closely aligned with management as to place the employee in a position of potential conflict in interest between his employer and his fellow workers.'" *Iowa S. Utils. Co.*, 207 N.L.R.B. 341, 345 (1973) (quoting *Ill. State Journal-Register, Inc. v. NLRB*, 412 F.2d 37, 41 (7th Cir. 1969)).

Wolf Creek's only argument regarding alignment of interests appears on the final page of its brief, where it cites *Concepts & Designs, Inc.*, 318 N.L.R.B. 948 (1995), *enf'd* 101 F.3d 1243 (8th Cir. 1996), and contends the Union failed to come close to satisfying its burden on that issue. Wolf Creek's argument, however, is not based on a potential conflict of interest between Wolf Creek and the Buyers' fellow workers. As Wolf Creek bears the burden of proving the Buyers are managerial employees and, as discussed in footnote 7 below, *Concepts & Designs* is not a binding case, we do not consider alignment with management as a separate issue.

manager or members of the department responsible for a requisition. And, although in some circumstances [the B]uyers continue to make vendor decisions on routine and cheap purchases, they do so guided by [Wolf Creek's] detailed procedures and nearly always select either the lowest bidder or the supplier who can provide the materials within the requisitioning department's timeline. [The] Buyers no longer perform technical bid evaluations, add new suppliers without authorization, independently decide which suppliers to utilize for engineered or safety-related materials, or negotiate prices for goods and services. Moreover, [the B]uyers are now more frequently limited to obtaining materials from a single source, either because they are constrained by [Wolf Creek's] association agreements, or because the choice of supplier is dictated by [Wolf Creek's] engineering requirements.

. . . . [The B]uyers have little if any independent purchasing authority, and they often rely on others within [Wolf Creek's] organization to determine which supplier to use. Although [the B]uyers still act as [Wolf Creek's] agent[s] to commit [Wolf Creek's] funds by issuing purchase orders, they neither make the ultimate decision to acquire materials or approve the acquisition of materials.

2017 Decision at 9–10 (citation omitted). Based on these findings, the Regional Director reached his ultimate conclusion: The "Buyers operate within the confines of detailed policies, and they do not exercise the type of discretion indicative of managerial status" and are therefore "entitled to the protection of the Act." *Id.* at 10.

3. **Specific Substantial Evidence Challenges**

Wolf Creek challenges four of the Regional Director's underlying factual findings, or it makes assertions that are directly contrary to those findings. Before addressing the Regional Director's ultimate factual conclusion—the Buyers were nonmanagerial employees—we address Wolf Creek's challenges to the underlying facts found by the Regional Director.

To begin, Wolf Creek mounts two challenges to the Regional Director's determination that the Buyers "neither make the ultimate decision to acquire materials [n]or approve the acquisition of materials." 2017 Decision at 10. First, Wolf Creek alleges that for the last eighteen years the Buyers have "made the ultimate decision concerning the acquisition of materials." Wolf Creek's Br. at 51. Second, it argues that the "Buyers remain responsible for committing funds in the company's best interest." *Id.* at 54. We reject both arguments because the Regional Director's finding refers to decisions made by others that limit the Buyers' involvement. The Buyers initiate purchases only in response to requisitions filed by someone else. The requisitions reflect (1) the decision to acquire materials, (2) the supervisory approval of such acquisition, and (3) the price ceiling for the purchase. Thus, there is substantial evidence in the record to support a finding that the Buyers are not responsible for these decisions.

The Regional Director also determined the "[B]uyers have little if any independent purchasing authority, and they often rely on others within [Wolf Creek's] organization to determine which suppliers to use." 2017 Decision at 10. Wolf Creek attacks this finding by arguing the Buyers issue purchase orders, issue RFQs, and use their independent judgment to select suppliers. As discussed at length above, however, there is substantial evidence in the record to support the Regional Director's finding that the Buyers routinely consult with others in the company to select a supplier from competitive bids. *See supra* Part I.C.2.c. And it is undisputed that the Buyers' purchasing authority exists only when a requisition has been submitted by a supervisor with the appropriate level of

authority, and that the requestor's authority sets the ceiling of the Buyers' authority. Substantial evidence, therefore, supports the Regional Director's finding.

Next, Wolf Creek asserts the Buyers were involved in the decision to increase the minimum requirement for competitive bidding from $5,000 to $50,000. Contrary to Wolf Creek's assertion, however, the Regional Director concluded the Buyers were not consulted about this decision. Wolf Creek does not contend the Regional Director's finding presents a substantial evidence problem, but rather simply ignores the finding and points to evidence in the record that could support a contrary finding. It is true the testimony is inconsistent on this point, but we cannot "displace the Board's choice between two fairly conflicting views," *Universal Camera*, 340 U.S. at 488. Despite the conflicting testimony, there is substantial evidence for the Regional Director's finding.

Finally, Wolf Creek claims "the Buyers negotiate the final purchase price for goods and services." Wolf Creek Br. at 55. Again, Wolf Creek does not assert this as a substantial evidence challenge but instead, advances it despite the Regional Director's contrary finding that the Buyers do not "negotiate prices for goods and services." 2017 Decision at 9. To be sure, there was conflicting evidence on this point. One Buyer testified that the Buyers "try to save the company money" by "negotiating with the suppliers." Tr. at 161. But when a different Buyer was asked whether the Buyers negotiate prices with suppliers, the Buyer responded, "No, not really. We just basically go out and get different bids to get a better price. We don't go back and say, how about X-amount instead of this, or whatever. That doesn't really happen." *Id.* at 167. The Buyers' supervisor corroborated that point of view when he testified that negotiation in

29

the competitive bidding process is "minimal." *Id.* at 206. The supervisor also testified that Buyers have "negotiated savings" in two circumstances. *Id.* at 207. The first is when the Buyer achieves "cost avoidances" by, for example, finding a better deal on freight charges. *Id.* The second is "when you have your single sole sources. When you find other opportunities based on the bid that you'[v]e got that you can get favorable pricing from an individual through negotiations with them." *Id.*

It is unclear from the context of the supervisor's testimony exactly when or how the Buyers will negotiate with single source suppliers. It is, however, apparent from the record that the Buyers do not negotiate the alliance agreements that select the single source suppliers. Nor do the Buyers independently reevaluate the pricing in those agreements to determine whether the goods or services could be procured at lower prices.

Although Wolf Creek can point to some evidence supporting its claim that the Buyers exercise discretion in negotiating the purchase price for goods and services, the Regional Director was not required to credit that evidence over the substantial contrary evidence. And because Wolf Creek bears the burden of proving the Buyers fall within the managerial employee exclusion, *cf. Ky. River Cmty. Care*, 532 U.S. at 711, it follows that Wolf Creek also bears the burden of placing evidence in the record to prove the Buyers were exercising discretion by negotiating the purchase price for goods and services. The Regional Director's finding that Wolf Creek failed to introduce sufficient evidence to

prove the Buyers were negotiating the purchase prices of goods and services is supported

by substantial evidence in the record as a whole.[9]

### 4. Buyers' Managerial Status

In challenging the Regional Director's ultimate finding, Wolf Creek proceeds

almost exclusively by comparing the facts here to those in previous Board decisions on

the managerial status of employees with purchasing authority. The Board treats prior

published opinions as binding precedent when the factual differences are "of no

substantive importance." *El Conquistador Hotel, Inc.*, 186 N.L.R.B. 123, 126 (1970); *see

also In re Sw. Reg'l Council of Carpenters*, 354 N.L.R.B. 930, 932 n.3 (2009)

(recognizing that when a prior Board decision reached a conclusion on "facts very similar

to those presented in this case," it "is controlling precedent for resolving this case").[10] As

---

[9] In asserting that the Buyers do negotiate the purchase prices, Wolf Creek also cites to transcript pages 326–27 and Wolf Creek's Procurement Policy section 6.2. Neither citation supports this proposition. The transcript citation discusses alliance agreements, which the Buyers are not responsible for negotiating. And Wolf Creek's Procurement Policy section 6.2 says nothing about Buyers negotiating prices.

[10] Notably, two cases are heavily discussed by the parties that are not binding precedent of the Board and are therefore absent from our analysis. The first is *Concepts & Designs*, 318 N.L.R.B. 948. Wolf Creek devotes five pages of its brief arguing the Regional Director's managerial status decision should be rejected because *Concepts & Designs* "is controlling and the Regional Director failed to correctly apply it to the facts in this matter." Wolf Creek's Br. at 44. In denying review of the 2017 Decision, the Board explained that Wolf Creek's reliance on *Concepts & Designs* was inappropriate because "the Board did not pass on the issue of managerial status" in that case. 2017 Denial Order at n.1. The employer in *Concepts & Designs* had prevailed on the managerial status issue before the Administrative Law Judge, and the employer was the only party to file exceptions to that decision. 318 N.L.R.B. at 948, 956–57. It is "the Board's settled practice" to limit review of a judge's decision to the issues raised by exceptions, even where the Board "do[es] not necessarily agree with the judge's discussion" of other issues. *FES & Plumbers & Pipefitters Local 520 of United Ass'n*,

a result, we begin by addressing whether prior Board decisions mandate the conclusion that the Buyers are managerial employees. We then discuss the substantial evidence in the record supporting the Regional Director's finding that the Buyers are not managerial employees.

### a. *Prior Board decisions*

When concluding the Buyers were nonmanagerial employees, the Regional Director relied on two of the Board's prior decisions, *Washington Post Co.*, 254 N.L.R.B. 168 (1981), and *Lockheed-California Co.*, 217 N.L.R.B. 573 (1975). Wolf Creek takes three general exceptions to the Regional Director's reliance on those decisions in its analysis. First, Wolf Creek argues the Regional Director failed to properly apply other cases where an employee with discretionary purchasing power was considered a managerial employee. Second, Wolf Creek claims *Washington Post* is inapposite and cannot support a finding that the Buyers were managerial employees. Finally, Wolf Creek contends the Regional Director was incorrect in concluding that "in nearly all aspects, the

---

333 N.L.R.B. 66, 66 n.1 (2001). Because the Board did not consider the managerial status of the employees in *Concepts & Designs*, the case is not binding on the managerial status issue.

Second, Wolf Creek attempts to distinguish *Solartec, Inc.*, 352 N.L.R.B. 331 (2008), *enf'd at NLRB v. Solartec, Inc.*, 310 F. App'x 829 (6th Cir. 2009), which was cited in the 2016 Decision. In the 2017 Denial order, however, the Board emphasized it was not relying on the Regional Director's citation to *Solartec* in deciding to deny review because it was a two-member decision, and the Supreme Court recently held the Board cannot act as a two-member panel. *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 679 (2010). Therefore, *Solartec* is also not binding precedent.

[B]uyers' responsibilities appear to mirror the responsibilities of the non[]managerial buyers in *Lockheed*." 2017 Decision at 10. We address each of these arguments in turn.

### i. Purchasing authority

Wolf Creek makes much of the fact that the Buyers committed $21 million of Wolf Creek's funds in one year and can submit purchase orders for up to $250,000 without additional prior approval. Wolf Creek argues these levels are on par with or exceed levels held by buyers deemed managerial employees in other Board decisions. Wolf Creek's Br. at 55; Wolf Creek's Reply Br. at 13–14; *see also Salinas Newspapers, Inc.*, 279 N.L.R.B. 1007, 1008, 1010 (1986) (managerial employee extended over $1 million in credit each year); *Simplex Indus., Inc.*, 243 N.L.R.B. 111, 112 (1979) (managerial employee individually committed $5.75 million); *Fed. Tel. & Radio Co.*, 120 N.L.R.B. 1652, 1653–54 (1958) (managerial employee could commit $2,500 without approval); *Nat'l Cylinder Gas Co.*, 115 N.L.R.B. 726, 729 (1956) (managerial employee could commit up to $2,000); *Mack Trucks, Inc.*, 116 N.L.R.B. 1576, 1578 (1956) (managerial employees each committed between $800,000 and $6 million per year); *Am. Locomotive Co.*, 92 N.L.R.B. 115, 116 (1950) (managerial employees collectively committed $6 million). *But see Lockheed*, 217 N.L.R.B. at 574–75 & 575 n.10 (nonmanagerial employees could commit $50,000 without additional approval and purchased a combined $770 million in one year); *Wash. Post*, 254 N.L.R.B. at 189 (nonmanagerial employee committed up to $50,000 in purchases each month).

The problem with Wolf Creek's argument is that the employees in the comparison cases appear to have either independent authority to make purchases or have no spending

cap on filling requisitions, and the cases reveal no policies cabining the employees' discretion in procurements. *See Salinas Newspapers*, 279 N.L.R.B. at 1008 (discussing employee's almost unfettered discretion); *Simplex Indus.*, 243 N.L.R.B. at 112 (recognizing there were no procurement policies in place and the buyer was able to "issue[] and execute[] the purchase orders without any approval or review of his actions"); *Fed. Tel. & Radio Co.*, 120 N.L.R.B. at 1653–54 (providing a cap but no limit on discretion to purchase items); *Nat'l Cylinder Gas Co.*, 115 N.L.R.B. at 729 (recognizing employee's discretion in filling requisitions); *Mack Trucks*, 116 N.L.R.B. at 1578 (failing to discuss any limits on purchase price or applicable procurement policies); *Am. Locomotive*, 92 N.L.R.B. at 116 (providing no discussion on limits to individual purchases or discretion). Conversely, Wolf Creek's Buyers do not have the ability to requisition an item without oversight. For all practical purposes, the Buyers did not commit $21 million of Wolf Creek's funds each year. That amount was committed by the requestors, who dictate what purchase should be made and set the limits on the purchase price. While it is true the Buyers do not need additional authority for purchases up to $250,000, this is the case *only* if the requisition provided a purchase price of $250,000 and the requestor who submitted it had authority to approve a purchase at that price. In any other circumstance, the Buyers are required to receive additional approval to exceed the price authorized in the requisition by more than $1,000 per line item. In reality, the Buyer's discretion in committing Wolf Creek's credit is limited to the $1,000 per line item the Buyer can deviate from the requisition. In comparison to $21 million per year,

this $1,000 of authority is relatively insignificant.[11] *Cf. Lockheed*, 217 N.L.R.B. at 575 n.10 ("[W]hile the ability to commit [$50,000] of an employer's credit may be highly significant in the context of a small retail enterprise, it is of far less significance in the context of the aerospace industry."). We reject Wolf Creek's argument that we should deny the application to enforce the 2018 Decision because the Regional Director failed to rely on Board precedent.

      ii.    Comparison to *Washington Post*

Second, Wolf Creek argues the Regional Director "erred in comparing the . . . Buyers to other non-managerial employees whose duties and authority are wholly dissimilar," such as those in *Washington Post*. Wolf Creek's Br. at 49. In *Washington Post*, the assistant purchasing manager spent half her time in the stock area determining what items, such as scotch tape, paper, and preprinted forms, needed to be purchased and ordering them, authorizing between $25,000 and $50,000 in purchases per month. 254 N.L.R.B. at 189. The employer's guidelines "assist[ed] the purchasing agents when they seek to secure items." *Id.* Generally, bids were solicited from three vendors, and then, using "price and quality as guidelines," "the most appropriate vendor for the Employer" would be selected. *Id.* The Board found the assistant purchasing manager was nonmanagerial because while she was "able to commit the Employer to purchasing stock

---

[11] Wolf Creek also argues that the Regional Director failed to take into account the $300,000 the Buyers saved Wolf Creek. The Regional Director did take this into account, but he found the savings occurred in the course of following Wolf Creek's procedures and did not make the Buyer's managerial employees.

items, [she] must conform to certain Employer guidelines, and, on occasion, must clear decisions with higher department or company authorities." *Id.*

Wolf Creek argues it is "absurd" to compare the Buyers purchasing goods and services for a nuclear power facility with the assistant purchasing manager in *Washington Post,* who purchased scotch tape and paper. Here, "the Buyers are often purchasing equipment under onerous specifications needed to ensure the safety of the entire facility." Wolf Creek's Reply Br. at 11.[12] We are unpersuaded. The Buyers have little to no discretion when it comes to technical and safety-related items.[13] Recall that the Buyers are limited to approved vendors for all safety-related items, and the Buyers cannot issue a purchase order for safety and special scope purchases without final approval by others. Relatedly, any technical changes to RFQs must be approved by the appropriate department. And the Buyers consult with the requestor when evaluating purchase options, except for low cost, routine purchases.

The Regional Director's comparison to *Washington Post* is not so far out of bounds that we would deny the application for enforcement on that ground.

---

[12] In support of this proposition, Wolf Creek cites to transcript pages 399:19–400:11. Importantly, within that testimony, the Buyer says, "I'm not going to choose out of those bids who we are going to purchase the fans from. That would be done . . . by the engineering department . . . ." Tr. at 400:1-4.

[13] The record reflects that the Buyers do, however, have discretion in deciding whether to competitively bid items such as toilet paper and nuts and bolts.

### iii. Comparison to *Lockheed*

Finally, Wolf Creek argues the Regional Director's reliance on *Lockheed* "constitutes an error at law." Wolf Creek's Br. at 49. In *Lockheed*, the buyers were responsible for procuring items for their employer—a company engaged in the aerospace industry—in response to requisitions. 217 N.L.R.B. at 574, 575 n.10. The decision to procure items could be made only by an authorized individual in the organization; the buyers did not have such authorization. *Id.*

After receiving a requisition, the buyers generated a bid list and selected a supplier from the responses, although both actions were subject to review. *Id.* Once a supplier was selected, the buyer was responsible for negotiating unsettled terms, usually including price, based on an approved negotiation range. *Id.* When the terms were fixed, the buyer was required to receive final authorization before executing a purchase order. *Id.* at 575. After the purchase was completed, the buyer remained responsible for coordinating "the Employer's relationship with its suppliers and customers," including "the resolution of problems which arise in relation to items the [b]uyer has procured." *Id.*

The Board concluded the buyers in *Lockheed* did not "have discretion in the performance of their jobs independent of their employer's established policy." *Id.* In reaching that conclusion, the Board was "not unmindful of all the various activities and functions of the [b]uyers, particularly their credit committing function" to the tune of $770 million each year. *Id.* at 575 & n.10. But the buyers' activities were "circumscribed to varying degrees by the Employer's established policy or by the review power placed in

37

higher authority." *Id.* at 575. Therefore, the Board concluded the buyers did "not exercise sufficient independent discretion in their jobs to truly align them with management." *Id.*

Wolf Creek argues *Lockheed* is inapposite because those buyers (1) were not subject to educational requirements; (2) had little discretion in formulating bid lists; (3) were given a level of authorization based on estimated cost of procurement rather than the requestor's purchasing power; (4) were subject to greater scrutiny when selecting winning bidders; and (5) "could not be further from" the Buyers in this case because the Buyers "alone are responsible for resolving issues, including negotiating price and delivery disputes."[14] Wolf Creek's Br. at 45–47.

Wolf Creek fails to explain the significance of the educational requirements or how the level of purchasing power is determined. While there are some differences between the procurement process used by *Lockheed* and that used by Wolf Creek, including whether limitations on discretion were imposed by supervisor review or by employer policy, those differences are not so substantial as to compel rejection of the Regional Director's conclusion. And the distinctions between the Buyers here and the employees in *Lockheed* and *Washington Post* are no more material than the differences

---

[14] This fifth argument is an inaccurate characterization of the buyers' responsibilities in *Lockheed*. The Board explicitly determined the buyers were responsible for negotiating unsettled terms and conditions, including price, and for "coordinat[ing] the Employer's relationship with its suppliers and customers," including "the resolution of problems which arise in relation to items the Buyer had procured." *Lockheed*, 217 N.L.R.B. at 574–75. Additionally, as discussed above, there is substantial evidence to support the Regional Director's conclusion in this case that the Buyers are not responsible for negotiating the final price.

between the Buyers and the managerial employees in the cases advanced by Wolf Creek. In summary, prior Board decisions do not provide any basis for refusing to enforce the 2018 Decision.

    b. *General substantial evidence for nonmanagerial status*

The Regional Director ultimately concluded the Buyers were nonmanagerial employees because they "operate within the confines of detailed policies, and they do not exercise the type of discretion indicative of managerial status." 2017 Decision at 10. There is substantial evidence in the record to support that finding.

From the initiation of the procurement process forward, the Buyers' discretion is cabined by Wolf Creek's policies. As discussed, the requestors, not the Buyers, determine what items to purchase and the amount to be spent—within $1,000 per line item. And no matter what, the Buyers' spending authority is limited to $250,000, absent special authorization.

Although Buyers are generally required to competitively bid purchases expected to exceed $50,000, various circumstances have reduced competitive bidding to 10% of purchases. This is true even though the Buyers have the discretion to competitively bid purchases below the $50,000 threshold. For example, Wolf Creek's policy does not require competitive bidding when there are alliance agreements in force, there are "[f]ewer than three qualified suppliers," during plant emergencies, or when there is an "[e]stablished supplier that has previously demonstrated a competitive cost." Employer's Ex. 1 at p. 3, no. 6.1. Competitive bidding is further limited due to the age of the plant and the specialized nature of some materials needed. In addition, all safety-related

purchases must be made from an approved supplier and there is often only one approved supplier, obviating the need for competitive bidding.

If a purchase is competitively bid, the Buyer has the discretion to create the list of places to send RFQs, except for safety-related items, which are limited to approved suppliers. By policy, the Buyers determine which suppliers to send RFQs "based on commercial, technical, and/or quality considerations" and "should consider source recommendations offered" by the requestor. Employer's Ex. 1 at p. 4, no. 6.3. If a supplier requests an exception to the RFQ that consists of any technical changes to equipment, the Buyer is required to receive approval for the alteration. Under Wolf Creek's policy, the Buyer must communicate all exceptions or clarifications "to the appropriate organization/department for resolution." Employer's Ex. 1 at p. 4, no. 6.5.1.

Once the Buyer receives bids, the Buyer will perform a commercial evaluation to "determine the best cost, best delivery of the requested product." Tr. at 184. Generally, however, for routine or low-cost items the Buyer will simply select the lowest bid. But the Buyer may select a slightly more expensive bid depending on delivery timeframes.[15] Conversely, when there are technical purchases, it is up to the requesting department to evaluate the technical requirements, the quality, the price, and the timeframe to determine which bid to accept. And if the Buyer is not making a routine or low-cost purchase, the Buyer will "consult the requestor" when deciding who won the bid. Tr. at 329.

---

[15] In making this decision, the Buyer will still often consult with his or her supervisor or the requestor.

Regardless of whether a purchase was competitively bid, the Buyers are generally not authorized to submit a purchase order for an item for an amount greater than $1,000 per line item above the amount approved in the requisition. The Buyers are also not allowed to submit a purchase order for "safety related and special scope purchases" without review and approval from Procurement Quality. Employer's Ex. 2 at p.7, no. 6.2.5. And the Buyers' supervisor can cancel any purchase order after it is issued. Once a purchase order issues, the Buyers are responsible for arranging shipping and have some discretion in selecting a shipping service. But that discretion has been somewhat limited by price negotiations through alliance agreements. Additionally, the Buyers will handle some disputes with suppliers after the purchase has been completed.

The Supreme Court has emphasized that employees are managerial if they exercise discretion in performing their job, but not "if th[at] discretion must conform to an employer's established policy." *Bell Aerospace*, 416 U.S. at 288 n.16 (quoting *Retail Clerks Int'l Ass'n*, 366 F.2d at 645). The Regional Director considered all the evidence and found that, "in nearly all aspects of their jobs, [the B]uyers 'act[] within prescribed limits under policies determined by company officials and only with clearance or approval by superior authority.'" 2017 Decision at 10 (quoting *Iowa S. Utils. Co.*, 207 N.L.R.B. 341, 345 (1973)). There is substantial evidence in the record supporting the Regional Director's conclusion that the Buyers are operating within the confines of detailed policies. As one Buyer testified, "[t]he culture, [has] become a lot stricter. . . . [Y]ou hear the term, literal compliance, literal compliance to procedures almost daily. I mean, . . . you know, do it to the letter of the law." Tr. at 156. The Regional Director's

41

conclusion that Wolf Creek failed to prove the Buyers are managerial employees is "rationally based on articulated facts and consistent with the Act," *Yeshiva Univ.*, 444 U.S. at 691, so "we must accord great respect to the expertise of the Board," *Loretto Heights Coll.*, 742 F.2d at 1255.

We reject Wolf Creek's challenges and therefore conclude the Board is entitled to enforcement of the 2018 Decision. *See* 29 U.S.C. § 160(e).

### III.    CONCLUSION

The Board "correctly interpreted and applied the law" and "its factual findings are supported by substantial evidence in the record as a whole." *Greater Kan. City Roofing*, 2 F.3d at 1051. We GRANT the Board's application for enforcement of the 2018 Decision.

Entered for the Court


Carolyn B. McHugh
Circuit Judge